[No. C058943. Third Dist. Dec. 1, 2010.]

CHRISTOPHER J. OLSEN, Plaintiff and Appellant, v.
JOSEPH F. HARBISON III, Defendant and Respondent.

COUNSEL

Freidberg & Parker, Edward Freidberg and Suzanne M. Alves for Plaintiff and Appellant.

Ellis, Coleman, Poirier, LaVoie & Steinheimer, Mark E. Ellis, Ronald R. Poirier and Daniel D. McGee for Defendant and Respondent.

OPINION

HULL, J.—This case involves a dispute between two attorneys over the division of fees. A client hired plaintiff Christopher J. Olsen to represent her in a personal injury action. Plaintiff subsequently brought in associate counsel, defendant Joseph F. Harbison III, doing business as Law Offices of Joseph F. Harbison & Associates. The client soon fired plaintiff and retained defendant. The case settled for $775,000.

Plaintiff filed a complaint against defendant to recover attorney fees by asserting claims for quantum meruit, breach of contract, fraud and deceit, intentional interference with contractual relationship, and imposition of constructive trust. In several rulings, the trial court disposed of these claims in favor of defendant.

Plaintiff appeals from the ensuing judgment and challenges each of the trial court's determinations. We affirm the judgment.

### FACTS AND PROCEEDINGS

In 1998, Kathleen Klawitter was injured at a golf course. She signed a contingent fee retainer agreement for plaintiff to represent her in a personal injury action.

In 2002, plaintiff decided to associate more experienced trial counsel into the case, and he contacted defendant. The two attorneys reached an agreement, reflected in their correspondence, which outlined a division of attorney fees that gave 60 percent to defendant and 40 percent to plaintiff. If the case went to trial, defendant would receive two-thirds of the fees; if the case settled at mediation, the fees would be split equally.

Pursuant to rule 2-200 of the California Rules of Professional Conduct (subsequent rule references are to the California Rules of Professional Conduct), Klawitter signed an authorization for this fee division on July 31, 2002.

A few weeks later, Klawitter fired plaintiff from her case and entered into a new fee agreement with defendant. Her case ultimately settled for $775,000. Plaintiff did not receive any attorney fees.

In a first amended complaint, plaintiff alleged six causes of action against defendant: (1) quantum meruit, (2) breach of contract, (3) fraud, (4) intentional interference with contractual relationship, (5) breach of fiduciary duty, and (6) declaratory relief seeking the imposition of a constructive trust. Plaintiff alleged that defendant planned from the outset to lure Klawitter as a client and obtain 100 percent of the attorney fees.

We describe the court's rulings in detail later in our opinion. Briefly, the trial court sustained defendant's demurrer to the quantum meruit cause of action, ruling that there was no basis for such a claim because plaintiff performed services for his client, not defendant. Plaintiff subsequently filed a second amended complaint, asserting causes of action for (1) breach of contract, (2) fraud and deceit, (3) intentional interference with contractual relationship, and (4) imposition of constructive trust. The trial court granted summary adjudication on the second and third causes of action, concluding that the challenged communications were protected by the litigation privilege of Civil Code section 47, subdivision (b). In a second motion for summary adjudication, defendant challenged the breach of contract claim, again arguing that plaintiff's only remedy lay in a quantum meruit claim against Klawitter. The trial court agreed, concluding that any contractual obligation to plaintiff under the fee-sharing agreement was extinguished when Klawitter discharged plaintiff as her attorney.

The only remaining cause of action at the time of trial was that for constructive trust/unjust enrichment. Defendant moved for judgment on the pleadings, asserting that as a matter of law, defendant was limited to seeking restitution through a quantum meruit valuation in a suit against Klawitter. Plaintiff responded that he could amend his cause of action to state claims for conversion and money had and received. The trial court granted judgment on the pleadings and rejected plaintiff's proposed amendment.

The court subsequently entered judgment in favor of defendant and plaintiff appeals.

DISCUSSION

I

*Quantum Meruit*

Plaintiff's first amended complaint included a cause of action for quantum meruit. Plaintiff alleged that the reasonable value of the services he provided to Klawitter was $310,000, an amount equivalent to the agreed-upon contingent fee of 40 percent of the gross settlement. He asserted that defendant had not paid him any portion of the attorney fees, that he had been damaged by this failure, and that defendant would be unjustly enriched if he retained the entire attorney fees. Plaintiff also alleged that defendant had failed to reimburse plaintiff for expenses plaintiff had advanced.

The trial court sustained defendant's demurrer to this cause of action, ruling the complaint did not state sufficient facts to constitute a claim for quantum meruit. The court explained, "The letter agreement confirms that defendant will associate into the Klawitter v. Farris case as co-counsel and as primary trial counsel. Neither in that agreement nor in . . . the complaint is there any indication that plaintiff would or did perform services for defendant rather than for Klawitter, plaintiff's client."

Plaintiff challenges this determination. We conclude that the trial court properly sustained defendant's demurrer.

In reviewing a ruling on a demurrer, we accept as true the properly pleaded factual allegations of the complaint. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 672 [34 Cal.Rptr.2d 386, 881 P.2d 1083].)

■ "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.' [Citation.] To recover in quantum meruit, a party need not prove the existence of a contract [citations], but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made' [citations]." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 458 [9 Cal.Rptr.3d 693, 84 P.3d 379] (*Huskinson*).)

■ Quantum meruit provides a means of recouping attorney fees when an action for breach of contract is untenable. For example, rule 2-200 precludes attorneys from dividing a fee for legal services if the client has not given written consent to the fee division. Although an attorney who has not

received this written consent cannot sue to obtain the specified fees, the attorney may sue the client in quantum meruit to recover the reasonable value of the services rendered on the client's behalf. (*Huskinson, supra,* 32 Cal.4th at pp. 458–464; *Fracasse v. Brent* (1972) 6 Cal.3d 784, 786, 790–791 [100 Cal.Rptr. 385, 494 P.2d 9].)

Similarly, if two law firms negotiate a fee-sharing agreement without obtaining the written consent of the client, a firm providing services under this agreement can obtain a quantum meruit recovery from the other firm for the reasonable compensation for its services. (*Huskinson, supra,* 32 Cal.4th at p. 460.) As the California Supreme Court explained, allowing quantum meruit recovery under these circumstances is consistent with case law providing that "attorneys may recover from their clients the reasonable value of their legal services when their fee contracts or compensation agreements are found to be invalid or unenforceable for other reasons." (*Id.* at p. 461.) Thus, in *Huskinson,* a case in which two law firms worked on a client's case without obtaining the written consent of the client for a fee-sharing arrangement, the court concluded that while rule 2-200 precluded a law firm from recovering on the fee-sharing agreement, the firm could nonetheless recover from the other firm the reasonable value of the legal services it rendered on the client's behalf. (32 Cal.4th at pp. 456, 464.)

Plaintiff contends that the principles enunciated in cases such as *Huskinson* demonstrate that his complaint properly alleges a cause of action for quantum meruit. Plaintiff fails to recognize one critical distinction between those cases and his own. *Huskinson* and other cited cases involve a situation in which a client did *not* consent to the fee-sharing agreement; here, in contrast, Klawitter agreed to the arrangement between plaintiff and defendant and signed a rule 2-200 consent form.

In the cases cited by plaintiff, an action was properly brought against associated counsel because the client had not agreed to the fee division. As *Huskinson* expressly stated, "The central issue . . . is whether, *in the absence of written client consent to an agreement between law firms to divide fees,* a law firm that is barred from dividing fees under rule 2-200 may nonetheless recover from the other law firm in quantum meruit for the reasonable value of services it rendered to advance the client's case." (*Huskinson, supra,* 32 Cal.4th at pp. 457–458; see also *Cohen v. Brown* (2009) 173 Cal.App.4th 302, 319–320 [93 Cal.Rptr.3d 24].)

Similarly, in *Strong v. Beydoun* (2008) 166 Cal.App.4th 1398 [83 Cal.Rptr.3d 632] (*Strong*), an attorney (the plaintiff) was brought into a case by another attorney and the two entered into a fee-sharing arrangement, but the client did not sign a rule 2-200 consent agreement. Some time afterwards,

the original attorney terminated the plaintiff's services, and then recovered a sizeable damages award for the client. The plaintiff sued the client for attorney fees under a quantum meruit theory. (166 Cal.App.4th at p. 1401.) Unsurprisingly, the court held that the plaintiff could not recover from the client, who had never hired the plaintiff or consented to her association. Under these circumstances, the plaintiff's claim was against the other attorney, the person with whom she had a financial arrangement. (*Id.* at p. 1404.)

Here, however, the client had a direct relationship with both plaintiff and defendant: she agreed to the association and consented to the fee division. *Huskinson* and *Strong* involve situations when no such consent has been obtained, and they are therefore inapplicable.

Plaintiff had a written retainer agreement with Klawitter, brought defendant into the case with Klawitter's consent, and then was fired by the client. Under these circumstances, plaintiff might be entitled to quantum meruit—from the client. Instead, he sought to recover the value of services rendered from defendant. There is no basis for such a claim, and the trial court properly sustained defendant's demurrer to this cause of action.

## II

### *Fraud and Deceit*

Plaintiff's second amended complaint included a cause of action for fraud and deceit in which plaintiff alleged that defendant made various representations in order to induce his association into the Klawitter action. Plaintiff asserted that defendant had no intention of performing any of these promises and that his representations were made with the intent of obtaining all attorney fees for himself while making plaintiff cover any costs. Plaintiff asserted that had he been aware of defendant's true intentions, he would not have brought defendant in as associate counsel.

The trial court granted summary adjudication on this cause of action (and a related claim for intentional interference with contractual relations, which we discuss later in this opinion). The court ruled: "To the extent [plaintiff's] fraud and interference claims are premised upon [defendant's] alleged disparaging communications regarding [plaintiff] to Klawitter, those communications are within the litigation privilege [of Civil Code section 47, subdivision (b).] . . . This is so even if the communications are alleged or proven to be false, fraudulent or the product of malice. Application of the litigation privilege in this context promotes the public policy behind that protection by encouraging first and foremost co-counsels' duty of loyalty and complete candor to the client which in turn promotes the utmost freedom of access to the courts, and

by curtailing the propagation of tangential derivative litigation arising from communications seemingly compelled by several ethical rules that guide co-counsel."

The court continued: "The other general group of alleged communications by [defendant] that underpin [plaintiff's] fraud and interference claims, are [defendant's] alleged false and fraudulent statements that induced [plaintiff] to invite [defendant] into the Klawitter representation, or accompanied the negotiation of terms between [plaintiff] and [defendant] regarding the representation. Given the fact that these communications were intended to serve the necessary purpose of identifying and securing co-counsel able to competently represent Ms. Klawitter in the pending action, the Court finds that these communications also fall within the bounds of the broad litigation privilege."

On appeal, defendant contends that the trial court erred in finding the litigation privilege precluded his claim for fraud and deceit. We disagree.

█ "The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' [Citation.] 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.] The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' [Citation.]

" 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' [Citation.] In order to achieve this purpose of curtailing derivative lawsuits, we have given the litigation privilege a broad interpretation." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 [63 Cal.Rptr.3d 398, 163 P.3d 89].) The privilege also encourages attorneys to protect their clients' interests, and is therefore "extended to attorneys to protect them from the fear of subsequent derivative actions for communications made in the context of judicial proceedings." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 30 [61 Cal.Rptr.2d 518].)

█ The breadth of the litigation privilege cannot be understated. It immunizes defendants from virtually any tort liability (including claims for fraud), with the sole exception of causes of action for malicious prosecution. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 215–216 [266 Cal.Rptr. 638, 786 P.2d 365].)

Plaintiff recognizes these principles but insists that the court erred in applying the litigation privilege in this case, and he asserts several theories to support his claim.

First, plaintiff contends that defendant's statements were not made in the course of a judicial proceeding. He argues that "[t]here was no dispute, much less a threat or consideration of litigation, between [plaintiff] and [defendant] at the time those communications were made." (Underscoring omitted.) Plaintiff focuses on the wrong litigation: it is the Klawitter action that is relevant.

Defendant's statements were made to plaintiff after the Klawitter litigation had been initiated. A complaint had already been filed, and the conversations between plaintiff and defendant occurred as part of plaintiff's efforts to engage associate counsel on the case to provide appropriate representation as the suit moved toward trial. The comments plaintiff characterizes as fraudulent were made in the course of those conversations, i.e., during the Klawitter litigation. Cases cited by plaintiff, discussing the extent to which the privilege applies to *prelitigation* activities (e.g., *Edwards v. Centex Real Estate Corp., supra*, 53 Cal.App.4th at pp. 28–37), are irrelevant.

Second, plaintiff contends that because defendant was not a participant in the Klawitter litigation when he made the alleged representations, the privilege does not protect him. We disagree.

The litigation privilege applies to statements made " 'by litigants or other participants authorized by law' " (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1241), and it attaches to communications "made in, or in anticipation of, litigation" (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1145 [57 Cal.Rptr.2d 284]).

Plaintiff correctly notes that defendant was not yet a participant in any litigation; however, it is equally clear that the conversation between plaintiff and defendant occurred in order to *make* defendant a participant by having him associate in as counsel on the Klawitter action. This connection is sufficient to meet the requirements of the litigation privilege. The litigation at issue was not hypothetical or abstract. To the contrary, a complaint had been filed and plaintiff was working on Klawitter's case. He wanted associate counsel to handle the trial work and related aspects of the litigation, and he spoke to defendant specifically for that purpose.

■ The litigation privilege attaches to prelitigation communications that are made at the point that "imminent access to the courts is seriously proposed by a party in good faith for the purpose of resolving a dispute . . . ."

(*Edwards v. Centex Real Estate Corp., supra*, 53 Cal.App.4th at p. 36.) Although defendant was not actually involved in the Klawitter litigation when his alleged statements were made, these communications were linked to ongoing litigation and his participation was imminent. They therefore fell within the ambit of the litigation privilege.

This case is unlike others relied upon by plaintiff, in which the challenged statements were made by someone who was a complete stranger to the litigation. For example, in *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326 [60 Cal.Rptr.2d 539], the litigation privilege did not apply when a third party filed a notice of lien in ongoing litigation. The court held, "A stranger to a civil action does not become a 'litigant or other participant' in the action merely by filing a notice of lien against any judgment or settlement proceeds the plaintiff might realize in the action." (*Id.* at p. 345.)

Here, defendant was being brought in as associate counsel and was not a "stranger" to the Klawitter litigation. This connection is sufficient to meet the privilege requirements.

At oral argument, plaintiff asserted that the recent decision of *Scalzo v. Baker* (2010) 185 Cal.App.4th 91 [109 Cal.Rptr.3d 638] supports his claim that the litigation privilege is inapplicable. We disagree. In *Scalzo*, which involved a legal dispute between two brothers, the defendant fraudulently obtained the plaintiff's credit card statements in an attempt to acquire information for litigation. The plaintiff sued for damages, including damages to his credit caused by the use and dissemination of these documents outside litigation. The court held that the litigation privilege "does not protect illegal conduct that results in damages unrelated to the use of the fruits of that of that conduct in litigation. Where, as here, damages separate from the litigation are demonstrated, the alleged wrongful, potentially criminal activity, is not immunized." (*Id.* at p. 100.) The present case, in contrast, centers on communications, not unlawful conduct. Just as importantly, the communications at issue here were directly related to the litigation. The nexus between the communications and the litigation stands in stark contrast to the situation in *Scalzo*.

Finally, plaintiff contends that the third and fourth elements of the litigation privilege were not met in that defendant's statements were not made to " 'achieve the objects of the litigation' " and did not have " 'some connection or logical relation to the action.' " (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1241.) Again, we disagree.

As the California Supreme Court observed, a communication in furtherance of the objects of the litigation is "simply part of" the requirement

that the communications be connected with, or logically related to, the litigation. (*Silberg v. Anderson, supra*, 50 Cal.3d at pp. 219–220; see *Rothman v. Jackson, supra*, 49 Cal.App.4th at p. 1141.) These two requirements overlap to a considerable degree and we therefore discuss them together.

Plaintiff asserts that defendant's statements were unconnected to any litigation because they were made purely for economic self-interest. The record reflects otherwise.

■ As we have repeatedly noted, defendant made his comments when discussing the possibility of becoming associated in on the Klawitter case. This conversation was part of plaintiff's efforts to bring in experienced counsel to assist on the case, take responsibility for the actual trial, and help Klawitter obtain a verdict or settlement. Had there been no litigation, these comments would never have been made. Remarks made in a setting like this can only be deemed connected to the litigation and subject to the litigation privilege.

Plaintiff's policy arguments are also unavailing. The litigation privilege is designed in part to "ensure free access to the courts" and "encourage zealous advocacy." (*Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1492 [25 Cal.Rptr.3d 109].) Conversations between plaintiff and defendant occurred in order to provide Klawitter with the best possible representation in her personal injury case. The purposes behind the litigation privilege are furthered when the privilege is applied to communications made in this setting.

III

*Interference with Contractual Relations*

■ Plaintiff asserts that the trial court erred in granting summary adjudication on his cause of action for intentional interference with contractual relations because defendant and plaintiff were not adverse parties at the time defendant made his statements. The litigation privilege does not include such a requirement.

The California Supreme Court has clearly defined the elements of the litigation privilege: it applies to any communication " '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' " (*Action Apartment Assn., Inc. v. City of Santa Monica, supra*, 41 Cal.4th at p. 1241.) The privilege immunizes

defendants in any tort action, with the exception of malicious prosecution. (*Silberg v. Anderson, supra*, 50 Cal.3d at pp. 215–216.)

Plaintiff relies on *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4th 392 [6 Cal.Rptr.2d 781] (*Mattco*), for the proposition that parties must be adverse litigants in order for the privilege to attach. Plaintiff misreads *Mattco*.

In that case, a company brought a lawsuit against its own expert witness for malpractice and related torts. (*Mattco, supra*, 5 Cal.App.4th at pp. 395–396.) The court likened this situation to a party bringing a malpractice suit against its own attorney and held that the litigation privilege does not apply to protect a " 'friendly' " expert witness. (*Id.* at p. 405.) The setting and issues in *Mattco* have little, if any, similarity to the situation before us, and nothing in *Mattco* purports to add a new requirement to those enunciated by the California Supreme Court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Unlike the situation in *Mattco*, the policies underlying the litigation privilege are strengthened by its application here, for the reasons already explained.

The privilege in fact has been applied in situations involving cocounsel. Most notably, in *Joseph A. Saunders, P.C. v. Weissburg & Aronson* (1999) 74 Cal.App.4th 869 [87 Cal.Rptr.2d 405], the plaintiff and the defendant jointly represented a group of hospitals. (*Id.* at pp. 870–871.) After the case settled, the plaintiff sued the defendant, asserting that it had made various misrepresentations in order to obtain a greater fee recovery at the plaintiff's expense. (*Id.* at p. 871.) The court rejected the idea that cocounsel owed a fiduciary duty to one another, noting that the duty of both attorneys was to serve the best interests of the client and exercise independent judgment on the client's behalf. (*Id.* at pp. 873–874.) The court also held that the defendant's allegedly defamatory statements to the client were absolutely protected under the litigation privilege. (*Id.* at pp. 874–875.) The court noted that the privilege was applicable " 'not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with libel or slander actions while acting for his client.' " (*Id.* at p. 875, quoting *Silberg v. Anderson, supra*, 50 Cal.3d at p. 214.)

Plaintiff argues that numerous cases, such as *Levin v. Gulf Ins. Group* (1999) 69 Cal.App.4th 1282, 1284–1288 [82 Cal.Rptr.2d 228] and *Frazier, Dame, Doherty, Parrish & Hanawalt v. Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 335–340 [138 Cal.Rptr. 670], have allowed litigation to proceed between cocounsel. If the litigation privilege applied even in nonadversarial settings, he asserts, these cases would not have been decided as they were. Plaintiff ignores one crucial fact. None of these cases

involved any issues relating to the litigation privilege, and they therefore provide no support for plaintiff's claim. (See *O'Keefe v. Kompa* (2000) 84 Cal.App.4th 130, 135, fn. 7 [100 Cal.Rptr.2d 602].)

In sum, the litigation privilege protected defendant's statements, and the trial court therefore properly granted summary adjudication on plaintiff's cause of action for interference with contractual relations.

## IV

### *Breach of Contract*

In his cause of action for breach of contract, plaintiff asserted that he and defendant entered into an agreement to "act as cocounsel in the Klawitter action and to divide attorneys' fees obtained upon completion of the Klawitter action, whether by resolution or trial." Plaintiff alleged that he had fulfilled his obligations under the contract but that defendant failed to pay him the agreed-upon portion of attorney fees or reimburse him for costs and expenses plaintiff advanced, and failed to hold these amounts in trust pending adjudication of the division of fees.

Defendant moved for summary adjudication on this cause of action. The trial court ruled that the determinative issue was a question of law, namely, "whether [defendant] owed any contractual duty to [plaintiff] under the alleged fee-sharing agreement after [plaintiff] was discharged by Klawitter since the discharge occurred before Klawitter recovered any monies." The court concluded that "as a matter of law, under the undisputed facts, [defendant's] contractual obligations to [plaintiff] under the fee-sharing agreement were extinguished by virtue of [plaintiff's] discharge from the representation of Klawitter. After [plaintiff] was discharged, he could not lawfully share the contingent fee contemplated by the existing contingency fee agreement with Klawitter. [¶] Moreover, after [plaintiff's] discharge, [defendant] had no independent contractual claim to any contingent fee against subsequent recovery by Klawitter, because [defendant's] claim to any such fee at that time was solely derivative of [plaintiff's] written contract with Klawitter."

The court explained: "Klawitter executed the *Authorization Pursuant to Rule 2-200 of Professional Conduct* form which specifies that the fee-sharing agreement between [plaintiff] and [defendant] is based upon the fee agreement (dated September 2, 1998) with the client, Klawitter. The 2-200 authorization provides that the client's assent would not increase the attorney's fees she had contracted to pay under her contract with [plaintiff], but is only an agreement between the attorneys as to how those fees are disbursed. [Citation.]

"The subject and purpose of the alleged fee-sharing agreement, a contingent fee under the [plaintiff]/Klawitter fee agreement, was extinguished with [plaintiff's] discharge. As a consequence, [defendant] had no contractual duty to [plaintiff] under the fee-sharing agreement after [plaintiff] was discharged."

The trial court therefore granted defendant's motion for summary adjudication.

On appeal, plaintiff challenges this determination. He contends that the fee-sharing agreement "is readily susceptible to the reasonable interpretation that the parties did not intend to limit the recovery only to fees recovered under the [plaintiff]/Klawitter contract, but reference to that contract [was] made to simply demonstrate the maximum fee the client was willing to pay for representation (40%)." He adds that his agreement with defendant can be construed "to reflect an intention by the contracting parties that [defendant] would assume responsibility for providing services in the Klawitter action, and that [plaintiff] was to be provided a share of the fees in recognition of the four years of labor already invested in that case, not as a guarantee of further performance. At the very least, [plaintiff's] evidence raises a triable issue of fact as to whether the fee sharing agreement was retrospective in its assignment of fees, or contemplated future performance." (Underscoring omitted.) He concludes that a breach of contract claim remains viable because the parties' agreement focused on the substantial services plaintiff provided before defendant came into the case and "contemplated only *de minimis* participation" by plaintiff once defendant became involved.

Neither the record nor the law supports plaintiff's claims.

According to their September 1998 fee agreement, Klawitter retained plaintiff to handle her claims for personal injuries sustained in a golfing incident. The agreement provided that if plaintiff obtained a recovery more than 60 days before the first assigned trial or arbitration date, he would be entitled to one-third of the amount recovered; if recovery occurred within 60 days of those dates, he would be entitled to 40 percent of the recovery. The agreement also provided that Klawitter was responsible "for all costs and medical bills, and should [plaintiff] advance costs and expenses on [Klawitter's] behalf, [Klawitter] agrees to reimburse [plaintiff] at his request for such costs over and above the charge for legal services."

On June 13, 2002, plaintiff wrote to defendant to confirm that defendant's office "will associate into the [Klawitter] action as co-counsel, and will act as primary trial counsel therein." The letter stated that fees would be divided between the two offices on a 50-50 split if the case was settled 60 or more days before trial, on a 60-40 split (favoring defendant) if the case was settled

within 60 days prior to trial, and on a two-thirds to one-third basis if the matter proceeded to trial. The letter added that "our respective offices will recover our costs and expenses incurred in connection with this action from the proceeds of any settlement, and judgment, or award."

Plaintiff outlined upcoming dates in the litigation, including depositions of the treating doctor and two percipient witnesses, and noted that these depositions could be continued if defendant wished to be present.

Defendant sent plaintiff a response on June 21, 2002. He stated that "in order for me to come into the case, as you know, it has to be moved. Since we are going to move the trial to make the fee agreement, we will take over the handling on a 60/40 split and if it actually goes to trial, 2/3, 1/3. Upon review of the fee agreement with the client and a successful motion to move the trial and keep discovery open, then we will have the client sign a Rule 2-200 document." Defendant outlined his upcoming schedule and listed some of the witnesses he wanted to contact and possibly depose.

These two letters form the parties' agreement. On July 21, 2002, Klawitter signed the rule 2-200 authorization, which acknowledged the agreement between plaintiff and defendant and agreed that defendant "shall receive a portion of the total attorney fees recovered, as set forth in the attached Retainer Fee Agreement, 60% to [defendant], 40% to [plaintiff] upon associating in, 2/3 to [defendant], 1/3 to [plaintiff] if tried, not to exceed 66/23% of the total net attorney's fees recovered. In the event my case is resolved at mediation, [plaintiff and defendant] shall each receive 50% of the total attorney fees. [¶] I understand that this agreement in no way increases the total attorney fees I have contracted to pay and is only an agreement between the attorneys regarding the disbursement of attorney fees."

Initially, we note that plaintiff's own statements refute his claim that the agreement between the parties contemplated only his "de minimis participation" once defendant became involved in the case. While defendant would act as lead trial counsel, plaintiff was not withdrawing from the case and would continue as cocounsel. In his letter to defendant, plaintiff stated that he would be conducting three depositions, one of the treating doctors and two of percipient witnesses, and he offered defendant the opportunity to be present on those occasions.

Plaintiff's complaint is replete with allegations describing his continued work on the Klawitter case after defendant became cocounsel. He alleged that defendant "would work with [plaintiff] in completing preparation of the Klawitter for trial." He recommended to Klawitter "that she permit [defendant] to associate into the Klawitter action and to thereafter act, *along with*

[*plaintiff*], as her counsel in that action." (Italics added.) Plaintiff asserted that he "continued the prosecution of the Klawitter action by, among other things, filing numerous motions, attending depositions in Northern California, and successfully opposing a Motion for Summary Judgment filed by several of the defendants in the Klawitter action." He added that defendant "did little in the continuing prosecution of the Klawitter action," and that defendant later expressed his desire for plaintiff to "*continue to* prepare pleadings and perform various other services" in connection with this litigation. (Italics added.) Plaintiff alleged that he "performed all actions in connection with the Klawitter action as [defendant] directed, including but not limited to preparing and opposing motions, attending all law and motion hearings and depositions conducted in connection with the Klawitter action, and hiring and advancing the charges made by local contract counsel to appear at ex parte applications because [defendant] stated he was too busy to attend." He also advanced additional funds in connection with the litigation.

Moreover, in his cause of action for fraud and deceit, plaintiff asserted that defendant caused him "to solely conduct as much of the remaining pre-trial litigation and discovery as possible" and "personally raise" as much of the financial resources required "before intentionally and wrongfully precipitating [plaintiff's] termination as counsel."

Given plaintiff's own representations, he cannot now claim that the agreement between plaintiff and defendant was primarily retrospective in nature, and "contemplated only *de minimis* participation" in the future.

More importantly, despite plaintiff's claims, it is not this question of fact that dooms plaintiff's case; it is a question of law.

Klawitter hired plaintiff as her lawyer. The subsequent association of defendant into the case was predicated on the retainer agreement between plaintiff and Klawitter, and Klawitter authorized the fee-sharing agreement in which defendant was to receive "a portion of the total attorney fees recovered, as set forth in the attached Retainer Fee Agreement."

As we have already explained in the context of plaintiff's quantum meruit claims, once Klawitter fired plaintiff as her attorney, the contract between them ceased to exist. When the Klawitter-plaintiff contract ceased to exist, the fee-sharing agreement between plaintiff and defendant, premised on that agreement, also ceased to exist. There was no viable contract on which to base a breach of contract claim against defendant, and the trial court therefore properly granted summary adjudication on this cause of action.

Perhaps anticipating such a conclusion, plaintiff asserts that triable issues of fact exist as to whether defendant was estopped from raising the termination of the Klawitter-plaintiff contract as a defense. He contends that if he can

demonstrate that defendant intentionally induced Klawitter to terminate her agreement with plaintiff, defendant cannot raise the termination as a defense to a breach of contract claim.

Plaintiff attempts to do indirectly what he cannot do directly. We have already determined that plaintiff's tort claims are barred by the litigation privilege. To permit a breach of contract claim based on these protected communications would undermine the policies behind the litigation privilege. Plaintiff cannot circumvent the privilege in this manner.

■ Moreover, contrary to plaintiff's assertion, the effect of Klawitter's termination of plaintiff was a matter argued at length in the trial court. As the trial court and we have reiterated, the *only* remedy available to plaintiff was to seek quantum meruit recovery against Klawitter. Estoppel cannot provide relief that is not legally available.

V

*Unjust Enrichment/Constructive Trust*

In the fourth cause of action, plaintiff alleged that defendant breached his agreement with plaintiff, made misrepresentations, acted fraudulently, and intentionally disrupted the relationship between plaintiff and Klawitter. He alleged that defendant "should be deemed to hold the amount of [plaintiff's] attorney fees, the amount of [plaintiff's] claim for reimbursement of costs and/or *expenses* advanced and/or incurred in connection with the Klawitter action, in constructive trust for the benefit of [plaintiff]" in order to avoid unjust enrichment. The trial court granted judgment on the pleadings on this claim.

Plaintiff contends that if any of his tort or quasi-contract claims against defendant are reinstated, his claim for unjust enrichment would also again be viable because "the opportunity to prove the predicate right or entitlement to those funds in [defendant's] possession would be reinstated." He also challenges the court's conclusion that his only remedy lies in legal action brought against Klawitter, his former client.

Plaintiff's claims require little analysis as none of the causes of action is being reinstated. Consequently, as defendant recognizes, there is no basis to impose a constructive trust.

## DISPOSITION

The judgment is affirmed. Defendant is awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Raye, Acting P. J., and Cantil-Sakauye, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 2, 2011, S189641. Cantil-Sakauye, C. J., did not participate therein.