Filed 4/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JOEL D. KETTLER, | B282160 |
| Cross-complainant and Respondent, | (Los Angeles County Super. Ct. No. LC101909) |
| v. | |
| LESLIE GOULD et al., | |
| Cross-defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Frank J. Johnson, Judge.  Affirmed.

The Ring Law Firm and Bart I. Ring for Cross-defendants and Appellants.

Fredman Lieberman Pearl and Howard S Fredman for Cross-complainant and Respondent.

———————————————

## SUMMARY

Cross-defendants Leslie Gould and his wife Susan Gould contend the trial court erred when it denied in part their anti-SLAPP (strategic lawsuit against public participation) motion. The motion sought to strike certain allegations in a cross-complaint filed by Joel D. Kettler, alleging defamation and other causes of action. The court denied the motion to the extent cross-complainant's claims were based on complaints to the Certified Financial Planners Board of Standards (the CFP Board), finding the CFP Board was not a public agency and there was no public interest issue. The court also denied the motion to the extent the claims were based on communications to cross-complainant's employer, finding the litigation privilege did not apply.

We conclude the trial court's ruling was correct on both points and affirm the order.

## FACTUAL AND LEGAL BACKGROUND

### 1.    The Cross-complaint

Cross-complainant is a financial planner and advisor who acted in that capacity for cross-defendant Leslie Gould's elderly parents from 1990 until they died, in 2010 and 2011. Cross-complainant had a "close familial relationship" with the Goulds. The elder Goulds gave cross-complainant a power of attorney in 2006, and he managed many aspects of their finances, including payment of their bills and disbursements they authorized to Leslie Gould and his sister. According to the cross-complaint, the parents made these arrangements after expressing concerns their children were spendthrifts who lived beyond their means, to control their access to the parents' funds.

After the deaths of the parents, cross-complainant became the trustee of the Gould Living Trust, of which Leslie Gould and

2

his sister were the beneficiaries. (Cross-complainant succeeded Leslie Gould, who resigned as trustee in June 2011.)

The cross-complaint alleges that in February and March 2013, cross-complainant learned that Leslie Gould had intentionally misdirected correspondence and financial statements to his home, to hide the existence of some of the trust's assets from his sister. Cross-complainant exposed this wrongdoing, as well as Leslie's interception of his parents' mail, including payments. The complaint alleges that, as a result of this exposure:

"13. . . . Cross-Defendants have engaged in a malicious, vicious, mean-spirited, scorched earth campaign against Cross-Complainant, falsely accusing Cross-Complainant of misappropriating the [elder] Goulds' funds and intentionally deceiving them to obtain the [power of attorney] and become the successor trustee. In addition to filing this frivolous lawsuit, Cross-Defendants have filed complaints with every person or agency imaginable, including, but not limited to, the Department of Insurance, Certified Financial Planner Board of Standards, Inc. ('CFP Board'), Financial Industry Regulatory Authority ('FINRA'), Cross-Complainant's employer, and any other government agency, company, or person that could possibly interfere with Cross-Complainant's ability to engage in his profession. As a result of Cross-Defendants' wrongful actions, Cross-Complainant's employment relationship with his employer has been terminated."

And:

"14. Cross-Defendants have also defamed Cross-Complainant's reputation to other Third Parties, including

3

to existing and potential clients, which has caused one or more clients to cancel their business with Cross-Complainant and no longer use Cross-Complainant as their financial planner/advisor. Cross-Defendants have caused Cross-Complainant to lose clients and hence, commissions, management fees, service fees and performance bonuses."[1]

The allegations just quoted are incorporated into each of the cross-complaint's nine causes of action.[2] In addition to damages, cross-complainant sought injunctive relief "preventing Cross-Defendants from continuing their wrongful conduct" in connection with several causes of action.

We will describe additional allegations as necessary in our discussion of the claims on appeal.

**2.      Cross-defendants' First Anti-SLAPP Motion**

Cross-defendants filed an anti-SLAPP motion (Code Civ. Proc., § 425.16).[3] They sought to strike the entire cross-complaint. Because all of cross-complainant's causes of action were based at least in part on unprotected activity, the court concluded the anti-SLAPP motion could be denied in its entirety, and did so. Cross-defendants appealed.

---

[1]      The term "Third Parties" refers to "Cross-Complainant's existing and potential clients."

[2]      The causes of action are libel per se, slander per se, defamation, trade libel, intentional interference with prospective economic advantage, intentional interference with contractual relationship, intentional infliction of emotional distress, breach of contract and unfair business practices.

[3]      Further statutory references are to the Code of Civil Procedure unless otherwise specified.

While the appeal was pending, the Supreme Court decided *Baral v. Schnitt* (2016) 1 Cal.5th 376 (*Baral*). *Baral* gives the courts and parties precise directions on an issue relevant to cross-defendants' motion: how a special motion to strike operates "against a so-called 'mixed cause of action' that combines allegations of activity protected by the statute with allegations of unprotected activity." (*Id*. at p. 381.)

Because the parties and the trial court did not have the benefit of *Baral*, and the trial court denied the anti-SLAPP motion without considering whether and to what extent allegations of protected activity could be stricken from a cause of action without affecting the allegations of unprotected activity, we reversed the trial court's ruling and remanded with directions to do so. (*Gould v. Kettler* (Oct. 31, 2016, B266652) [nonpub. opn.].)

## 3. Cross-defendants' Second Anti-SLAPP Motion and the Trial Court's Ruling

Before we turn to the ruling on appeal, we briefly explain the statutory background and the *Baral* decision the trial court was tasked with applying.

### a. The background

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) Acts in furtherance of free speech rights in connection with a public issue include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement

5

or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (*Id.*, subd. (e).)

When ruling on an anti-SLAPP motion, the trial court employs a two-step process.  It first looks to see whether the moving party has made a threshold showing that the challenged causes of action arise from protected activity.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)  If the moving party meets this threshold requirement, the burden then shifts to the other party to demonstrate a probability of prevailing on its claims.  (*Ibid.*)  In making these determinations, the trial court considers " 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' "  (*Ibid.*, quoting § 425.16, subd. (b)(2).)

### b.     The *Baral* case

*Baral* resolves the question how to treat a cause of action that is based on allegations of both protected activity and unprotected activity, enunciating several principles.

First, "when the defendant seeks to strike particular claims supported by allegations of protected activity that appear alongside other claims within a single cause of action, the motion cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity."  (*Baral, supra*, 1 Cal.5th at p. 392.)  To do so would "undermine[] the central

6

purpose of the statute:  screening out meritless claims that arise from protected activity, before the defendant is required to undergo the expense and intrusion of discovery."  (*Ibid.*)

Second, "an anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded." (*Baral, supra*, 1 Cal.5th at p. 393.)

Third, "[a]ssertions that are 'merely incidental' or 'collateral' are not subject to section 425.16.  [Citations.] Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute."  (*Baral, supra*, 1 Cal.5th at p. 394.)

Fourth, "*particular* alleged acts giving rise to a claim for relief may be the object of an anti-SLAPP motion.  [Citation.] Thus, in cases involving allegations of both protected and unprotected activity, the plaintiff is required to establish a probability of prevailing on any claim for relief based on allegations of protected activity.  Unless the plaintiff can do so, the claim and its corresponding allegations must be stricken." (*Baral, supra*, 1 Cal.5th at p. 395.)

Finally, for the guidance of litigants and courts, *Baral* provided a summary of the showings and findings required by the statute.  Thus:

At the first step, "the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them.  When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage.  If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached." (*Baral, supra*, 1 Cal.5th at p. 396.)

7

At the second step, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral, supra*, 1 Cal.5th at p. 396.)

### c. Cross-defendants' motion

Cross-defendants' second anti-SLAPP motion sought an order striking all allegations of " 'defamatory' communications or 'complaints' filed with" the California Department of Insurance, the CFP Board, FINRA, cross-complainant's employer (AXA Advisors, LLC), and Anthem Blue Cross. The motion also challenged "any and all communications preparatory to or in anticipation of the bringing of an action or other official proceeding . . . ." Cross-defendants argued their statements to FINRA, the Department of Insurance and the CFP Board were "absolutely privileged with no exceptions" and their statements to cross-complainant's employer "are clearly shielded by the litigation privilege . . . ."

The trial court granted cross-defendants' motion "as to the FINRA and the Department of Insurance based claim as, per . . . Sections 425.16(e)(1) or (2), these are essentially governmental agencies and any claims/complaint made to them would be protected." The court denied the motion "as to claims based on complaints to [the CFP Board], Anthem, [and] AXA . . . which are not public agencies and there is not a public interest issue here.

The Court does not find the litigation privilege argument with respect to AXA to be persuasive."

Cross-defendants filed a timely notice of appeal.

## DISCUSSION

Cross-defendants contend that any complaint filed with the CFP Board "must be considered 'protected speech,' " and that its prelitigation communications to AXA were protected speech and "should be considered absolutely privileged speech and not actionable pursuant to the litigation privilege." We disagree with both assertions.

**1.   The Complaint to the CFP Board**

   **a.   The background**

On April 11, 2014, Leslie Gould submitted a "Complaint Against a CFP® Professional" to the CFP Board.

The CFP Board, founded in 1985, describes itself as a "non-profit organization that serves the public interest by promoting the value of professional, competent and ethical financial planning services, as represented by those who have attained CFP® certification." The CFP Board "sets and enforces the requirements for CFP® certification," and "[i]ndividuals who successfully complete CFP Board's initial and ongoing certification requirements are authorized to use the CFP® certification marks in the United States."

According to the CFP Board, its "rigorous enforcement of its *Standards of Professional Conduct* – including releasing disciplinary information to the public – distinguishes the CFP® certification from the many other designations in the financial services industry." "[A] CFP® professional who violates CFP Board's ethical and practice standards becomes subject to

9

disciplinary action up to the permanent revocation of certification."

In his complaint to the CFP Board against cross-complainant (who is certified by the CFP Board as a CFP® professional), Leslie Gould complained of "embezzlement, elder abuse, co-mingling funds, breach of fiduciary duty, perjury, [and] filing false documents in court of law," and stated that "the funds [cross-complainant] embezzled he is now claiming to be fees he earned."

### b.     Contentions and conclusions

Cross-defendants first contend the complaint to the CFP Board was protected activity under the anti-SLAPP statute, as a statement made before, or made in connection with an issue under consideration or review by, an "official proceeding authorized by law." (§ 425.16, subd. (e)(1)&(2).) We disagree.

It is clear from the CFP Board's own description of its organization and activities that it is merely a privately organized group that promotes competent and ethical services in the financial planning industry. While that is a laudable objective that may be helpful to the public, it is not enough to transform its private certification and enforcement processes into an "official proceeding authorized by law." The authorities that have considered the meaning of the term "official proceeding authorized by law" make the point quite plain – including the case cross-defendants say supports their claim that a complaint to the CFP Board "should be deemed a quasi judicial public agency proceeding."

In *Kibler v. Northern Inyo County Local Hospital District* (2006) 39 Cal.4th 192 (*Kibler*), the Supreme Court held that "a hospital's peer review qualifies as 'any other official proceeding

authorized by law' under subparagraph (2) of subdivision (e) and thus a lawsuit arising out of a peer review proceeding is subject to a special motion under section 425.16 to strike the SLAPP suit." (*Id.* at p. 198.) The court rejected arguments that subdivision (e)(2) pertained only to proceedings before governmental entities. (*Kibler,* at pp. 201-203.) But the court clearly explained why a hospital's peer review procedure qualified as an "official proceeding authorized by law," namely: "because that procedure is required under Business and Professions Code section 805 et seq., governing hospital peer review proceedings." (*Id.* at p. 199; see *ibid.* [the Code "sets out a comprehensive scheme that incorporates the peer review process into the overall process for the licensure of California physicians"].)

In addition, *Kibler* pointed out "another attribute of hospital peer review that supports our conclusion," which was that "[a] hospital's decisions resulting from peer review proceedings are subject to judicial review by administrative mandate." (*Kibler, supra,* 39 Cal.4th at p. 200; see *ibid.* ["Thus, the Legislature has accorded a hospital's peer review decision a status comparable to that of quasi-judicial public agencies whose decisions likewise are reviewable by administrative mandate."].)

The CFP Board, and its procedures for investigating complaints, possess none of the attributes of an "official proceeding authorized by law." The CFP Board is not a government entity; it is not related in any way to a government entity; its procedures are not required by law; and its decisions are not subject to judicial review by administrative mandate. Accordingly, cross-defendants' complaint to the CFP Board is not protected activity, because it is not a statement made before, or made in connection with an issue under consideration or review

11

by, an "official proceeding authorized by law." (§ 425.16, subd. (e)(1)&(2).)

Cross-defendants next contend the CFP Board complaint is protected activity under subdivision (e)(3) of section 425.16. That subdivision protects statements and writings "made in a place open to the public or a public forum in connection with an issue of public interest." Cross-defendants contend that "[w]ebsites that are accessible to the public are 'public forums' for purposes of the anti-SLAPP statute," citing *Barrett v. Rosenthal* (2006) 40 Cal.4th 33 (*Barrett*). Cross-defendants misunderstand the import of *Barrett*, which has no application to the facts in this case.

In *Barrett*, the court observed that "[w]eb sites accessible to the public, *like the 'newsgroups' where [the defendant] posted [her codefendant's] statement*, are 'public forums' for purposes of the anti-SLAPP statute." (*Barrett, supra,* 40 Cal.4th at p. 41, fn. 4, italics added, citing cases; see, e.g., *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1007 [two websites satisfied the criteria for a public forum as " 'a place that is open to the public *where information is freely exchanged*' "; one website had " 'chat-rooms . . . open and free to anyone who wants to read the messages,' " with free membership entitling the member to post messages; the other website was "a forum where members of the public may read the views and information posted, and post on the site their own opinions" (italics added)].)

While the CFP Board's website was certainly accessible to the public, cross-defendants' complaint was not made on the website (nor did it involve an issue of public interest, as we discuss *post*). Cross-defendants did not use the website to file their complaint (nor, apparently, was it possible to do so). The complaint form is hand-written, and on its face instructs the

person complaining to fax or mail it to the CFP Board.  And the "CFP Board's Investigation Process" that Leslie Gould received from the CFP Board states that "[a]ll CFP Board investigations are confidential unless and until a public discipline is issued by CFP Board . . . ."

In short, statements are protected under subdivision (e)(3) of section 425.16 when they are "made in a place open to the public or a public forum."  Submitting a complaint to an organization does not become protected activity simply because that organization has a website.  Cross-defendants' complaint to the CFP Board had nothing to do with the use of its website as a public forum, and cross-defendants' claim of protected activity on this basis is simply inapt.

Finally, cross-defendants contend their complaint was protected activity under subdivision (e)(4) of section 425.16.  That subdivision protects "any other conduct" in furtherance of the rights of petition or free speech "in connection with a public issue or an issue of public interest."  Subdivision (e)(4) does not apply either, because cross-defendants' complaint accusing cross-complainant of embezzlement, elder abuse, perjury, and so on, is of interest only to the parties, not to the public.

Both subdivisions (e)(3) and (e)(4) of section 425.16 "are limited by the requirement that the statement or conduct be connected with an issue of public interest . . . ."  (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898.)  " 'The most commonly articulated definitions of "statements made in connection with a public issue" focus on whether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) the statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond

13

the direct participants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest.' " (*Greco v. Greco* (2016) 2 Cal.App.5th 810, 824 (*Greco*).) Cross-defendants apparently contend the subject matter of their complaint could affect " 'large numbers of people beyond the direct participants' " (*ibid.*), because of cross-complainant's conduct "handling the investments of many individuals including elders," and "the chance for elder abuse, fraud, and conversion of funds is a matter of public interest . . . ."

We reject the notion that "the chance" for elder abuse and fraud by a financial planner, without more, can transform a single claim of elder abuse and embezzlement into an issue of public interest. The case cross-defendants cite to support that notion does not do so.

In *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719 (*Fontani*), disapproved on other grounds in *Kibler, supra,* 39 Cal.4th at page 203, footnote 5, the matter at issue was the defendant's statement to the National Association of Securities Dealers (NASD), of which the defendant was a member, alleging the plaintiff (who had been the defendant's employee) "misrepresented information when selling annuities." (*Fontani,* at p. 732.) The court found the plaintiff's alleged misrepresentation was "conduct with the potential to affect not just [the plaintiff's] individual customers, but all those in the annuity market," observing that "mistruths about an annuity may artificially inflate the purchase price and thereafter affect the market." (*Id.* at p. 733.) Thus the defendant's statement to the NASD "concerning [the plaintiff's] purported misconduct . . . concern[ed] a matter of public interest under section 425.16, subdivision (e)(4)." (*Ibid.*)

14

This is not a case like *Fontani*, and cross-defendants submitted no evidence to suggest any questionable conduct by cross-complainant other than his handling of the financial affairs of the elder Goulds. The "chance" of misconduct toward others is completely speculative. We see no basis to conclude the conduct that is the subject of cross-defendants' complaint to the CFP Board is " 'conduct that could affect large numbers of people beyond the direct participants.' " (*Greco, supra,* 2 Cal.App.5th at p. 824; see *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [the defendant union's distribution of documents, containing allegedly false information criticizing the plaintiff's treatment of eight employees he supervised, did not concern a matter of public interest; "the only individuals directly involved in and affected by the situation" were the plaintiff and the eight employees]; *id.* at p. 925 [rejecting the attempt "to portray the situation . . . as affecting more than the eight individuals" and as "relat[ing] to . . . the broader issue of abusive supervision throughout the University of California system"].)

In sum, the trial court did not err in concluding the complaint to the CFP Board was not protected activity.

## 2. The Reports of Alleged Wrongdoing to AXA

Cross-defendants contend several of their communications to AXA, reporting cross-complainant's alleged wrongdoing, were prelitigation communications that were "absolutely privileged" under Civil Code section 47, subdivision (b)[4] and the anti-SLAPP

---

[4] "A privileged publication or broadcast is one made: . . . [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law,

15

statute. We agree with the trial court that the litigation privilege does not protect the communications in question.

We first describe the applicable legal principles and then the communications at issue in this case.

### a. The anti-SLAPP statute and the litigation privilege

The relationship between the anti-SLAPP statute and the litigation privilege is described in *Flatley v. Mauro* (2006) 39 Cal.4th 299, 322-324 (*Flatley*). Courts "have looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry—that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision (e)(1) and (2)." (*Id.* at pp. 322-323.) And, "[t]he litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing. (See, e.g., *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926-927 [where the plaintiff's defamation action was barred by Civil Code section 47, subdivision (b), the plaintiff cannot demonstrate a probability of prevailing under the anti-SLAPP statute] . . . .)" (*Flatley,* at p. 323.)

In this case, whether analyzed under the first or second step, the result is the same. The litigation privilege does not

---

or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure [(writ of mandate)]," with exceptions not applicable here. (Civ. Code, § 47, subd. (b).)

apply, so the trial court's refusal to strike the allegations in question was correct.

### b.    The litigation privilege

The litigation privilege "precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding." (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1172.)  Under the usual formulation of the privilege, it applies "to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).)  *Silberg* emphasizes that, to be protected by the litigation privilege, a communication must be "in furtherance of the objects of the litigation." (*Id.* at p. 219.)  This is "part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action." (*Id.* at pp. 219-220.)

"Many cases have explained that [Civil Code] section 47(b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 361.)  "A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*), citing cases; see also *Olsen v. Harbison* (2010) 191 Cal.App.4th 325, 334-335 ["The litigation privilege attaches to prelitigation

17

communications that are made at the point that 'imminent access to the courts is seriously proposed by a party in good faith for the purpose of resolving a dispute . . . .' "].)

"Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact." (*Action Apartment, supra,* 41 Cal.4th at p. 1251.)

### c. The communications in this case

The communications at issue in this case and relevant chronology are as follows.

On August 25, 2013, Leslie Gould "reported to AXA, who I believed to be the employer of [cross-complainant] at all times stated herein, using their dedicated 'fraud' email (ReportFraud@axa-equitable.com) what I believed to be the wrongdoing of [cross-complainant] in connection with my parents." The email, sent by Susan Gould at Leslie Gould's direction, stated:

"You should be aware that one of your employee[s] has performed illegal actions. [¶] We recently discovered that [cross-complainant] has embezzled approximately 6 figures of funds from our now deceased parents and committed numerous instances of financial elder abuse. [¶] His actions have been deliberate, intentional and show an ongoing and malicious pattern of his breach of fiduciary responsibility." The email described the background facts and types of illicit behavior, such as "electronic transfers going to [cross-complainant's] various credit cards," "false receipts," a "completely bogus" accounting, and concluded: "A plethora of other issues are also in play, all demonstrating [cross-complainant's] deliberate financial manipulations of our elderly parents' assets, both pre and post

18

death. The offenses are widespread and span several years. The examples cited above are just a few. All examples are supported with back-up documents. [¶] Please contact me anytime and we can meet and I can give you documentation. In the meantime, we have contacted FINRA, the DA and the FBI."

On February 10, 2014, five and one-half months later, Susan Gould on behalf of cross-defendants emailed AXA (Andrew Ziskin and Wendy Pontrelli), stating that: "I still see that as of today, [cross-complainant] is listed as 'my financial professional'. Please remove him immediately. [¶] Please let me know who at AXA I should follow up with regarding employee dishonesty. I have included this message to Wendy who we notified of [cross-complainant's] previous fraudulent activities." Cross-defendants repeated their earlier assertions about cross-complainant's various "nefarious actions," and stated they had "reason to believe that he may have taken out a life insurance policy (again, with Gould money) on either Donna or Danny Gould, for which he had absolutely no insurable interest. Please look into these matters."

The February 10, 2014 email also stated that "3 AXA annuities are still paying into a Gould Living Trust bank account"; that cross-complainant had refused to resign as trustee; and that: "We have filed a lawsuit seeking [cross-complainant's] removal as trustee, but he is using estate money to fight it while he crafts back-dated 'faux' letters trying to extricate himself from the lies he has been caught in. I would like to request that the annuities stop being deposited into the account and that AXA holds the money until this matter is resolved. [Cross-complainant] should have business insurance, so we are

19

requesting a copy of his policy.  [¶]  Thanks for your assistance and anticipated cooperation."**5**

On February 11, 2014, cross-defendants emailed AXA again, saying:  "Please let us know how we can assist you.  We have copious documentation demonstrating his fraud, elder abuse, and embezzlement."  (That same day, AXA assured cross-defendants "that [cross-complainant] no longer has access to your accounts and can no longer view account status.")

On July 22, 2014 (11 months after the August 2013 email and five months after the February 2014 email), Leslie Gould filed a lawsuit against cross-complainant, AXA and several AXA-related entities, alleging 10 causes of action, including various claims of fraud, unfair business practices, breach of fiduciary duty, negligence, elder abuse, conversion, and an accounting. (Those claims have been settled.)

### d.    Contentions and conclusions

Cross-defendants contend the trial court should have granted the anti-SLAPP motion, to the extent cross-complainant's claims were based on the communications to AXA we have just described.  The substance of cross-defendants' argument is that the same allegations of misconduct they communicated to AXA in August 2013 and February 2014 later

---

**5**      The lawsuit to which cross-defendants referred was a "Petition for Redress for Breach of Trust" filed on December 20, 2013, in the pending probate proceeding (*In the Matter of The Gould Living Trust*, BP133880), shortly after cross-complainant filed a final accounting.  The petition describes cross-complainant's alleged misappropriation of funds and sought an order removing him as trustee, a monetary surcharge and punitive damages.

20

appear in two lawsuits: first in Leslie Gould's December 2013 petition to the probate court to remove cross-complainant as trustee of the Gould Living Trust, and then in their July 2014 lawsuit against AXA and cross-complainant. Cross-defendants assert the communications in question therefore "have some connection or logical relation to" both the probate petition and the lawsuit and so are absolutely privileged.

We do not agree. The law requires more than "some connection or logical relation" to a later lawsuit. The communications must be made "to achieve the objects of the litigation" (*Silberg, supra,* 50 Cal.3d at p. 212), and prelitigation communications must be made at a time when litigation is "under serious consideration" (*Action Apartment, supra,* 41 Cal.4th at p. 1251). Cross-defendants' evidence fails both these tests.

First, none of the communications contains any suggestion that cross-defendants were contemplating a lawsuit against AXA. There is no threat of suit, no demand of any kind, no warning of possible litigation – literally nothing to suggest that litigation against AXA (or cross-complainant) was "under serious consideration." (*Action Apartment, supra,* 41 Cal.4th at p. 1251.) Cross-defendants merely reported cross-complainant's alleged wrongdoing and their contacts with "FINRA, the DA and the FBI"; said that "we can meet and I can give you documentation"; asked AXA to "[p]lease look into these matters"; and thanked AXA "for your assistance and anticipated cooperation."

Second, cross-defendants' declarations in support of the anti-SLAPP motion are likewise devoid of any statement that, at the time they communicated with AXA in August 2013 and February 2014, they were seriously considering filing the lawsuit

21

they ultimately filed in July 2014.  Leslie Gould states only that: "Following my reporting of suspected fraud by [cross-complainant], I was never interviewed (nor was my wife) and I never heard anything further from AXA.  I then decided to file the within action in July, 2014."

Third, so far as the probate proceeding is concerned, the communications to AXA could do nothing to further the objects of the litigation, which had nothing to do with AXA.  Those communications were entirely "extraneous to the action" (*Silberg, supra,* 50 Cal.3d at p. 220), and accordingly not protected by the litigation privilege.

In short, like the trial court, we see no evidence the communications at issue were "in furtherance of the objects of the litigation" ultimately filed or that they related to litigation that was under serious consideration when the communications were made.  (*Action Apartment, supra,* 41 Cal.4th at p. 1251; *Silberg, supra,* 50 Cal.3d at p. 219; see also *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 34-35, 36 [for the litigation privilege to attach to prelitigation statements, "a lawsuit or some other form of proceeding must actually be suggested or proposed," and "the contemplated litigation must be *imminent*" and "not a 'bare possibility' "; "the privilege attaches at that point in time that imminent access to the courts is seriously proposed by a party in good faith for the purpose of resolving a dispute"].)

Here, the communications at issue did not suggest or propose litigation.  "[I]n order to take advantage of the litigation privilege, respondents must establish that . . . they . . . seriously and in good faith proposed imminent access to the courts as a means of resolving their dispute." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1381.)  That did not

happen here.  The litigation privilege did not apply, and the trial court did not err.

## DISPOSITION

The order is affirmed.  Cross-complainant shall recover his costs on appeal.

GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.

ROGAN, J.*

---

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23