Filed 9/20/23  Kiesling v. Noon CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| HEATHER KIESLING,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ADELE NOON,<br><br>    Defendant and Appellant;<br><br>EVA LOUISE BUNETA et al.,<br><br>    Defendants and Respondents. | D078678, D079310<br><br><br>(Super. Ct. No. 37-2020-00030513-CU-PO-NC) |

APPEAL from orders of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Reversed in part, affirmed in part, and remanded with directions.

Law Offices of Lisa R. McCall, Lisa R. McCall, and Erica M. Baca for Plaintiff and Appellant, Heather Kiesling.

Behmer & Blackford and Timothy S. Blackford for Defendant and Appellant, Adele Noon.

Horton, Oberrecht & Martha and Nathaniel J. Michels for Defendants and Respondents, Eva Louise Buneta and Jon N. Buneta.

Law Offices of Joseph Barr & Associates and Joseph J. Barr, Jr. for Defendants and Respondents, Walter Robert Hagen and Yvette Noble Hagen.

Neighbors in a community in Carlsbad, California, who all lived close to the elementary school their young children attended, became embroiled in a feud. The conflict intensified after the daughter of parent Adele Noon fell off a rolling backpack outside the school and the girl's older brother filed a report with the school alleging one of the feuding parents, Heather Kiesling, intentionally caused the fall. Kiesling was involved in separate altercations with two other sets of parents and Kiesling's husband Michael, an attorney, sent cease and desist demands to Walter Robert (Rob) Hagen and Eva Louise Buneta threatening restraining orders against them if they did not stay away from his wife. Kiesling alleges these parents, in retaliation, then asked the school to ban her from campus.

Kiesling eventually obtained temporary civil harassment restraining orders against Hagen and Buneta and also brought the underlying civil lawsuit against Noon, Hagen and his wife Yvette Noble Hagen, and Buneta and her husband Jon N. Buneta. In the civil case, Kiesling alleged claims for defamation, assault, stalking, intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, illegal electronic eavesdropping and recording, and negligence. Noon, the Hagens, and the Bunetas each brought special motions to strike Kiesling's claims under Code

of Civil Procedure section 425.16[1], asserting the claims arose from protected speech and that Kiesling could not show a probability of prevailing on the merits of the claims.

The trial court granted in part and denied in part each motion, concluding several of Kiesling's allegations arose from protected speech and that some of her corresponding causes of action had no merit.  The court struck two entire causes of action, Kiesling's claims for invasion of privacy and illegal electronic eavesdropping and recording.  Kiesling appeals these orders, and also appeals the three subsequent orders entered by the court awarding attorney's fees and costs to the defendants based on their partially successful special motions to strike.

On appeal, Kiesling asserts the trial court erred by partially granting the motions to strike because the defendants failed to establish that any of the allegations underlying her claims for defamation, invasion of privacy, and electronic eavesdropping arose from conduct that was in furtherance of the defendants' rights of petition or free speech in connection with a public issue.  Kiesling further argues that even if the defendants did show their conduct was protected, the court erred by finding she did not meet her burden to show a likelihood of prevailing on the merits of her claims.

As to the fee awards, Kiesling argues that because the motions to strike were improperly granted, the fee awards likewise must be reversed.  In addition, Kiesling contends that even if the order partially granting Noon's motion to strike is not reversed, the fee and cost award in her favor was

---

[1]    Code of Civil Procedure section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute.  (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)  Subsequent undesignated statutory references are to the Code of Civil Procedure.

granted in error because she failed to achieve the objective of her motion to strike, which was a complete dismissal from the lawsuit.

Noon also appeals from the order denying in part her anti-SLAPP motion. She asserts the court erred by not granting her motion fully since all of Kiesling's allegations about Noon concern protected speech and Kiesling failed to show a sufficient probability of prevailing on the claims arising from those allegations.

As we shall explain, we agree with Kiesling that the trial court erred by granting the Hagens' and Bunetas' anti-SLAPP motions to the extent that those motions were based on the defendants' conduct of videorecording Kiesling, which is not protected under section 425.16. As a result, we also reverse the subsequent fee orders in favor of these defendants so that on remand the trial court can reevaluate those awards in light of our decision. We affirm the trial court's orders on Noon's anti-SLAPP motion, rejecting both Kiesling's and Noon's appellate arguments, and affirm the subsequent fee award entered in favor of Noon.

FACTUAL AND PROCEDURAL BACKGROUND

In the summer of 2017, Adele Noon and her family moved into the neighborhood where the Kieslings, the Hagens, and the Bunetas lived. Noon and Kiesling were next door neighbors and lived around the corner from the elementary school attended by the parties' children. Noon and Kiesling were initially on friendly terms. However, in late 2018, Kiesling's and Noon's relationship became strained. Kiesling thought Noon was too demanding, asking Kiesling to frequently help with her school-age children. Noon thought Kiesling was "erratic and unstable" and eventually asked Kiesling to give her family space.

4

On a Friday afternoon in May 2019, Kiesling walked her two children home from school and approached two of Noon's children, who were walking home alone, from behind. What happened next is in dispute. Kiesling asserts that as she tried to pass the slow-moving Noon children she accidentally bumped Noon's second-grade daughter, who was riding on a rolling backpack called a "Zuca," causing the girl to fall off the Zuca to the ground and begin to cry. Noon alleges her children reported to her that Kiesling intentionally pushed her daughter off the backpack, and that her daughter cried all the way home. Noon says the incident traumatized her daughter and left her afraid of Kiesling.

Thereafter, Noon's son, a sixth-grade student at the time and who witnessed the incident, filed a "student accident report" with the school. In the report, the boy stated, "My neighbor was behind us near the end of the crowd on Friday. She said 'I'm gonna make you go faster' and kicked the back of my sister's Zuca. She then said 'sorry' sarcastically and I said 'that was not okay!' My sister cried and I walked her home ...." The principal of the school then conducted a short investigation into the accident report, speaking with both Noon and Kiesling.

Kiesling told the principal she put her foot on the backpack to stop the girl from falling and that the fall was accidental. The principal testified at a hearing on Kiesling's requests for restraining orders against Rob Hagen and Eva Buneta, that during her investigation she had a discussion with Kiesling about school safety, ensuring that students are not touched, and that parents are not involved with school discipline.[2] The principal testified that her investigation was inconclusive as to how Noon's daughter fell.

---

[2]    After the meeting, Kiesling sent a letter to the principal reiterating her position that she did not intentionally cause Noon's daughter to fall.

Later in May, Kiesling had a tense interaction with Yvette Hagen, who lived across the street from the Kieslings. Kiesling's dog ran across the street and jumped up on Yvette, who was holding her own smaller dog. Kiesling alleged that Yvette kneed her dog causing the dog to lick that spot for two days; Yvette stated she merely turned away from Kiesling's dog and held her knee up to avoid the dog.

The following August, Kiesling's children were playing on a slope in front of the Hagen's property. Kiesling stated that Rob Hagen demanded that her children get off of his property and that she responded that it was not his property. The Hagens' declarations state that Rob only asked the children to stay off the slope because it was not safe and it was damaging to the landscaping. Kiesling alleged that the following day she had another altercation with Rob and Yvette Hagen in front of their home, asserting that Rob came out of his house and began yelling in her face in front of her children about the dog incident and the disputed property line.

Shortly after, Michael Kiesling wrote a letter to the parties' homeowners association (HOA) and a separate email to Rob Hagen. The letter to the HOA asserted that the Hagens did not own the portion of the property that the Kiesling children had played on and that Rob had inappropriately yelled at Kiesling and their children to get off his property. Michael's email to Rob asserted that Rob had physically threatened Kiesling and attached a copy of the letter to the HOA. The email further threatened that if Rob had any additional contact with Kiesling or their children, "you and I will have a very serious problem," and that if Rob attempted "to interfere with [the Kiesling's property] rights again, [the Kieslings] will evaluate available legal remedies."

Unsurprisingly, Kiesling's relationships with her neighbors did not improve thereafter. Kiesling said that Eva Buneta, whose family was close with the Hagens, and whose husband Jon coached Kiesling's son in soccer and baseball, became cold towards her. Kiesling stated in her declarations in opposition to the motions to strike that Eva told Kiesling it would be best if they did not speak. Kiesling also alleged Eva filmed their interactions with her phone. In her declaration, Kiesling described feeling intimidated and uncomfortable around the Hagens and Bunetas, who she said had previously been friendly to her, and stated the women glared at her when they were together at the elementary school, spoke in hushed tones with other parents in her presence, and continued to record her. Kiesling also asserted that Jon was unkind to her son at a soccer game, isolating him from the group when he was not paying attention, which resulted in Kiesling moving her son to a different team.

Kiesling reported that one day in October, Eva and Yvette were walking behind Kiesling at school pickup, when Eva said, "excuse us," and brushed Kiesling's arm. This caused Kiesling to believe a "physical attack might be imminent." Kiesling stated she learned later that Yvette was filming the incident. The following day, Michael sent an email to Jon Buneta demanding Eva stay at least 50 feet away from Kiesling and desist "glaring" at Kiesling or trying to make her and their children feel uncomfortable. Michael's email stated that if Jon did not reply assuring his wife's compliance with the demand, Michael would obtain a restraining order against Eva.

Kiesling alleges in her complaint and her declarations that the next day, Rob Hagen, entered the neighborhood in his large sport utility vehicle and saw Kiesling and her children walking. She alleges Rob made eye contact with her, sped up his vehicle, and came within 10–12 feet of her and

7

her children. According to Kiesling, this resulted in a panic attack and her no longer feeling safe in the neighborhood alone. Shortly after, Kiesling again observed Eva filming her. Later that month, Kiesling obtained a temporary civil harassment restraining order against Rob Hagen.

Although the timing is unclear from the record, sometime around these incidents, the Hagens and Bunetas spoke with the elementary school principal about their relationship with the Kieslings. The school principal testified at the hearing in the restraining order cases, which took place on October 13, 2020, that the Hagens spoke with her in the summer of 2019— after the backpack incident involving Noon's children and the confrontation on their property with Kiesling. According to the principal, the Hagens told her they were concerned about the safety of their children because of Kiesling's interaction with the Hagens over their property line.

The following fall, the Hagens' twin daughters were placed in the same class as Kiesling's son, prompting the Hagens to again speak with the school principal. The principal testified that they were concerned for their daughters' safety and wanted the principal to keep a close eye on the class. The principal agreed to do so. The Bunetas also raised concerns about Kiesling to the principal. They sent the principal email communications and also met with her in the fall of 2019. Like the Hagens, the Bunetas expressed concern for the safety of their children at the school because of Kiesling's behavior. The Bunetas asked the principal not to place their child in the same class as Kiesling's child and to keep an eye on their children to ensure their safety.

After the meetings with the Hagens and Bunetas, the principal called a meeting with the Kieslings. The principal told the Kieslings multiple families had expressed concerns about the Kieslings' behavior in the

8

neighborhood and asked them to do "everything in their power to make sure that they didn't increase any concerns," and to "mak[e] sure they were mindful about not being too close to the families" involved in order to maintain a "peaceful, positive, productive learning environment on … campus." The principal also explained at the restraining order hearing that another parent had reported to her that after Kiesling's daughter told Kiesling about a conflict with another child at school, Kiesling had approached the child and demanded an apology and possibly grabbed the child's arm. The principal testified that in her meeting with Kiesling, Kiesling denied touching the child.

Kiesling's complaint alleges that throughout the fall of 2019 and into the following year, Eva Buneta and Yvette Hagen continued to videorecord Kiesling and otherwise make her feel uncomfortable by glaring at her and turning other parents and community members against her. In February 2020, Kiesling obtained a temporary civil harassment restraining order against Eva Buneta. In April 2020, the Hagens moved away from the neighborhood.

Neither the Hagens nor the Bunetas denied filming the Kieslings. Both sets of parents stated in their declarations in support of their motions to strike that they began filming their public interactions with Kiesling because of her irrational behavior and her and her husband's threatened and actual legal proceedings against them.

On August 26, 2020, Kiesling filed the underlying complaint. Therein, she alleged the defendants engaged in a conspiracy to make her life and her "children's day to day lives so miserable that they would no longer have the emotional capacity to remain in the neighborhood or school and would move away." With respect to Noon, Kiesling's complaint asserted that shortly after

9

they met, Noon began making inappropriate demands of Kiesling to care for Noon's five children. In the same timeframe, Noon began complaining about Kiesling's dog barking loudly, which caused Kiesling to complain to Noon about her children playing too loudly in their neighboring backyard. Kiesling further alleged this conflict caused Noon to retaliate when her daughter fell off the Zuca backpack by telling her son to blame Kiesling. According to Kiesling, Noon then engaged in a campaign to defame her as a child abuser.

The complaint also alleged that Rob Hagen assaulted Kiesling by yelling at her, first when her children played on the slope next to or on the Hagens' property and again the next day in front of their home. Kiesling also alleged that the five defendants conceived of a "malicious campaign of retribution against [Kiesling] and her children" by approaching the authorities at their children's shared elementary school and demanding she be banned from the campus in an effort to "retributively intimidate and torment" Kiesling and her children.[3] Kiesling alleged that the defendants made false reports to the principal and other school authorities defaming her.

Kiesling's complaint asserts eight causes of action against all of the defendants: defamation, assault, stalking under Civil Code section 1708.7, intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, electronic eavesdropping and recording in violation of Penal Code section 632, and negligence. Following the filing of Kiesling's complaint, the Hagens, the Bunetas, and Noon each brought motions to strike certain allegations in the complaint. Noon argued that allegations in the complaint against her arose from protected speech,

---

[3] The complaint also alleges that the defendants tried to get the principal fired when she did not agree to their demand to ban Kiesling from campus.

10

including her communications with school officials about the incident when her daughter fell off her rolling backpack.

The Hagens' motion asserted that all of Kiesling's allegations against them arose from three types of events, all protected by the anti-SLAPP statute. Their motion asked the court to strike all eight causes of action Kiesling asserted against them. Specifically, they argued Kiesling's claims arose from their protected right to (1) request the Kieslings to leave their property or they would report her to the police; (2) communicate to their children's school seeking to obtain a safe environment; and (3) record Kiesling in public to obtain evidence for the legal proceedings initiated by Kiesling and related to their complaints to the school.

The Bunetas' motion argued that the complaint asserts various types of conduct (driving a car at Kiesling; Eva running into Kiesling; glaring; threatening to have the principal fired; making defamatory statements to the elementary school principal and to the school superintendent, other parents, the pest control employee, and the gardener; videorecording Kiesling and her children; isolating Kiesling's son at a soccer practice; and yelling at Kiesling to stay off property), and that certain of that conduct is protected. Specifically, they argued anti-SLAPP protection should be afforded to Kiesling's allegations of (1) reports and statements to the school and school officials, (2) defamatory statements to other parents and community members to warn them about Kiesling's dangerous conduct, and (3) videorecording Kiesling to obtain evidence for the legal proceedings initiated by her and for any school-related investigation.

Kiesling opposed the three motions, asserting that none of her allegations arose from protected speech or activity.[4] In her opposition to Noon's motion, Kiesling argued that all of the speech underlying her defamation claim occurred after August 2019 and thus was unrelated to the rolling backpack incident that occurred the prior May and therefore not a part of any official proceeding at the school. Further, she asserted any allegedly defamatory statements to members of the community other than school officials were not protected because the statements did not involve a matter of public interest. Kiesling also submitted her own declaration and that of her husband, as well as various documents, that she argued showed a sufficient probability of prevailing on each claim.

In her oppositions to the Hagens' and Bunetas' motions, Kiesling argued that the defamatory statements she alleged were not connected to any official proceeding, nor were they related to any matter of public interest. In addition, as in her opposition to Noon's motion, she argued her evidence showed a sufficient probability of prevailing on each cause of action.[5]

Noon, the Hagens, and the Bunetas each submitted reply briefs and a joint hearing on the motions took place shortly after. At the hearing, after argument by all parties, the trial court took the matter under submission. The following week, the court issued separate orders on each special motion to strike.

In its order on Noon's motion, the court concluded all of Noon's statements to school and school district staff were protected under

---

[4] All of Kiesling's opposition briefs and supporting papers were filed late. The trial court, however, exercised its discretion to consider the documents.

[5] Kiesling also filed objections to the evidence submitted by her opponents.

section 425.16, subdivision (e)(1) and that Kiesling had failed to demonstrate a likelihood of success on the merits of any claims based on the protected allegations. The court granted her motion with respect to specific paragraphs of the complaint, striking paragraphs 28, 42, a portion of 47, 59–61, 67, 71, 75–78, and portions of paragraphs 80 and 103. The court denied the motion with respect to allegations of statements made to third parties unrelated to the school proceedings, declining to strike paragraph 45, and the remaining portions of paragraphs 47, 80, and 103.

The trial court's orders on the Hagens' and Bunetas' motions are substantially similar. The court concluded that all of the allegations concerning statements made to school personnel were protected speech and that Kiesling had not shown a probability of prevailing on the claims connected to those allegations because they are protected by the litigation privilege. The court also found the defendants' videorecording of Kiesling was protected activity since it was specifically done in response to the threatened and actual litigation commenced by Kiesling against them and that Kiesling had not met her burden to show a sufficient probability of prevailing on her claims for invasion of privacy and illegal eavesdropping and recording based on those allegations. In accord with these findings, the court granted the motion with respect to specific paragraphs of Kiesling's complaint, striking paragraphs 5(g), 28, 39–43, a portion of paragraphs 47 and 51, 53–54, 59–61, 67, 71, 75–78, and a portion of paragraph 103. In addition, the court entirely struck Kiesling's sixth and seventh causes of action for invasion of privacy and illegal eavesdropping and recording, respectively.

In each order, the court also granted the defendants' requests for an award of reasonable attorney's fees to be determined by noticed motion.

Kiesling timely appealed from the three orders and Noon appealed from the order denying in part her motion. Thereafter, the defendants filed motions for awards of attorney's fees. The Bunetas moved for an award of fees and costs of $28,948. The Hagens moved for a total award of $28,648. Noon's motion sought a total award of $35,500, including $30,846 for fees and costs associated with her motion to strike and an additional $4,654 in fees and costs for the fee motion itself.

After additional briefing and hearings on the fee motions, the court partially granted each motion. The court slightly reduced the fees requested by the Bunetas to exclude amounts not attributable to the anti-SLAPP motion and then awarded half of that amount plus costs, $12,548. The court reduced the fee award based on the fact that the Bunetas obtained some, but not all, of the relief they requested in their motion to strike. The court awarded the Hagens $13,248, similarly reducing their requested award by half based on their partial success on their motion to strike. The court awarded Noon costs and attorney's fees of $24,000, slightly less than the $29,855 requested, reducing the award for fees requested that were unrelated to the ant-SLAPP motion or duplicative, and slightly discounting the award to account for the fact that Noon was not completely successful. The court also granted Noon's request for fees and costs associated with the fee motion itself.

Kiesling timely appealed from all the orders partially granting the anti-SLAPP motions and from the three fee award orders.[6]

DISCUSSION

As discussed, Kiesling challenges the trial court's orders granting in part the defendants' special motions to strike. She first asserts the trial court erred because the defendants failed to establish that any of the allegations underlying her claims for defamation, invasion of privacy, and electronic eavesdropping arose from conduct that was in furtherance of the defendants' rights of petition or free speech in connection with a public issue. Kiesling further argues that even if the defendants did show their conduct was protected, the court erred by finding she did not meet her burden to show a likelihood of prevailing on the merits of her claims.

As to the attorney's fees and costs awards, Kiesling argues that because the motions to strike were improperly granted, the fee awards likewise must be reversed. In addition, Kiesling contends that even if the order granting Noon's motion to strike in part is not reversed, the fee and cost award in her favor was granted in error because she failed to achieve a complete dismissal from the lawsuit.

In her cross-appeal, Noon argues the court erred by not granting her motion in full because all of Kiesling's allegations about Noon concern protected speech and Kiesling failed to show a sufficient probability of prevailing on the claims arising from those allegations.

---

[6]     Kiesling's appeals from the orders on the anti-SLAPP motions and her appeal from the fee award in favor of Noon, as well as Noon's cross-appeal from the partial denial of her anti-SLAPP motion were assigned by this court to one case number, D078678. Kiesling's appeals from the fee award orders in favor of the Bunetas and Hagens were assigned to a separate case number, D079310. On Kiesling's motion, the appeals were consolidated.

# I

## *Anti-SLAPP Legal Principals*

Section 425.16 sets a procedure for striking "lawsuits that are 'brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Kibler v. Northern Inyo County Local Hosp. Dist.* (2006) 39 Cal.4th 192, 197.) Under section 425.16, the "trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

Section 425.16 provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Resolution of an anti-SLAPP motion "thus involves two steps. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820.) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Id.* at p. 820.)

16

"A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' (*Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53,] 66), and that the plaintiff's claims in fact *arise* from that conduct (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063).  The four categories in subdivision (e) describe conduct ' "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." '  (§ 425.16, subd. (e).)"  (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.)

Defendants here contend Kiesling's causes of action arise from three of these categories:  "written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(1)); "written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (*id.*, subd. (e)(2)); and "conduct in furtherance of the exercise of  the constitutional right of petition or ... free speech in connection with a public issue or an issue of public interest" (*id.*, subd. (e)(4)).

With respect to the first two categories protected by the statute, "[t]he moving party need not separately demonstrate that such an oral or written statement concerns an issue of public significance." (*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271.)  However, to satisfy section 425.16, subdivision (e)(4), the speech or conduct must relate to an issue of public interest.  (See *Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 874 [" '[O]nly one of the four categories of protected activity covers [noncommunicative] conduct

17

(§ 425.16, subd. (e)(4) ...) and that type of protected activity must have taken place "in connection with a public issue or an issue of public interest." ' "] (*Old Republic*).)  In addition, the statute is construed broadly to maximize protection for acts in furtherance of the right to petition.  (§ 425.16, subd. (a) ["The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."].)

"A defendant's burden on the first prong is not an onerous one.  A defendant need only make a prima facie showing that the plaintiff's claims arise from the defendant's constitutionally protected free speech or petition rights.  (See *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.)  ' "The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law." [Citation.]  "Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary.  [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." ' " (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112, italics omitted; see also *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 426 ["Any claimed illegitimacy of the defendant's acts is an issue that must be raised and supported by the plaintiff in discharging its burden on prong two.  [Citations.]  'To conclude otherwise would effectively

18

shift to the defendant a [merits] burden statutorily assigned to the plaintiff.' "].)

For purposes of both prongs of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff ...." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) However, "when the complaint itself alleges protected activity, a moving party may rely on the plaintiff's allegations alone in arguing that the plaintiff's claims arise from an act 'in furtherance of the person's right of petition or free speech.' " (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 929 (*Bel Air*).) Section 425.16 "does not require a moving party to *submit* declarations confirming the factual basis for the plaintiff's claims." (*Ibid.*) To do so would preclude relief for defendants who dispute the plaintiff's claims, having "the perverse effect of making anti-SLAPP relief unavailable when a plaintiff alleges a baseless claim, which is precisely the kind of claim that section 425.16 was intended to address." (*Ibid.*)

With respect to the second prong, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] [Like the trial court, we] consider 'the pleadings, and supporting and opposing affidavits … upon which the liability

19

or defense is based.' (§ 425.16, subd. (b)(2).)" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) Our de novo review "includes whether the anti-SLAPP statute applies to the challenged claim." (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.) "[W]e apply our independent judgment to determine whether" the claim arises from acts done in furtherance of the defendants' "right of petition or free speech in connection with a public issue." (*Ibid.*) "Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [the plaintiffs have] established a reasonable probability that [they will] prevail on [their] claims." (*Ibid.*)

II

*Analysis*

A

*The Defendants' Statements to School Officials*

*Are Protected Petitioning Activity*

Kiesling asserts that the trial court erred by finding the defendants' alleged statements to the elementary school principal and other school officials were protected. She makes several arguments to support this claim. First, Kiesling asserts that there was no official proceeding authorized by law because her complaint addresses only conduct occurring long after the "Zuca accident." Next, she contends that the statements made by the Bunetas and Hagens are not protected because they relate only to the conflict among adults, and did not concern "school" business.

With respect to Noon, Kiesling asserts that Noon's declaration in support of her motion did not satisfy prong one because it is self-serving, not sufficiently specific, and not designed to prompt official action because Noon's demands to have Kiesling removed occurred long after the Zuca accident.

Kiesling also asserts that the two cases relied on by the trial court to find protected petitioning activity, *Lee v. Fick* (2005) 135 Cal.App.4th 89 (*Lee*) and *Brody v. Montalbano* (1978) 87 Cal.App.3d 725 (*Brody*), are distinguishable.

With respect to the Bunetas, Kiesling also contends they did not satisfy their burden on prong one because the declarations they submitted in support of their motion to strike did not mention any communication to the school or assert that their communications to the school were designed to prompt official action. This argument lacks merit. The Bunetas denied making the statements that Kiesling attributed to them in her complaint and in her declaration in support of her opposition briefs. Accordingly, the Bunetas' declarations reflect this position and do not describe the statements alleged solely by Kiesling. The Bunetas, like the other defendants, sought to strike the allegations contained in Kiesling's complaint that were premised on the protected activity of reporting Kiesling's behavior to school officials to prompt official action, i.e. banning her from the school's campus and nearby sidewalks. The fact that the Bunetas' declarations do not address these alleged statements, which they deny making, is not dispositive. (See *Bel Air, supra*, 20 Cal.App.5th at p. 929 [requiring the "moving party to *submit* declarations confirming the factual basis for the plaintiff's claims" would have "the perverse effect of making anti-SLAPP relief unavailable when a plaintiff alleges a baseless claim"].) Rather, the Bunetas appropriately relied on the allegations contained in Kiesling's complaint to establish their alleged speech is protected.

As with the Bunetas, Kiesling also finds fault with Noon's declaration. She argues that it is insufficient to sustain her burden on prong one of the anti-SLAPP analysis because it is self-serving and vague as to the timing of Noon's complaints to school officials. These arguments are also without

merit. Kiesling's complaint and her own declarations supporting her opposition to the defendants' anti-SLAPP motions are replete with the alleged specific details about the defendants' statements to the principal and other school officials that establish the protected nature of the communications at issue. These documents are sufficient to support the court's finding. (See *Bel Air, supra*, 20 Cal.App.5th at p. 929.)

Kiesling next contends that her allegations concerning the Bunetas', the Hagens', and Noon's statements to the principal and other district employees are not protected because those statements did not seek to prompt official action since they occurred after the principal completed her investigation of the Zuca accident.

It is well-settled that "the 'official proceeding[s]' provision of section 425.16, subdivision[s] (e)(1) [and (e)(2)] ha[ve] language parallel to that contained in the 'official proceeding[s]' provision of Civil Code section 47, subdivision (b)." (*Lee, supra*, 135 Cal.App.4th at p. 96.) " '[J]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege of Civil Code section 47, subdivision (b) [citation], … such statements are equally entitled to the benefits of section 425.16.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.)

"Civil Code section 47, subdivision (b) provides that any publication made in any 'judicial proceeding' or 'in any other official proceeding authorized by law' is privileged. The privilege is designed to provide the utmost freedom of communication between citizens and public authorities whose responsibility is to investigate wrongdoing. [Citation.] Accordingly, communications to an official agency *intended to induce* the agency to initiate action are part of an 'official proceeding.' [Citation.] Thus it is well settled

22

that complaints to school authorities about a teacher or principal in the performance of his or her official duties are privileged." (*Lee, supra*, 135 Cal.App.4th at p. 96, italics added.)

We agree with the Bunetas, the Hagens, and Noon that the statements they allegedly made to school authorities are properly characterized as part of an official proceeding authorized by law, even though some of the alleged statements occurred several months after Noon's daughter fell off the Zuca backpack. The school principal is charged with maintaining safety at the public school. Indeed, at the restraining order hearing the principal testified that safety at school is her highest priority. The allegations made by Kiesling that were stricken from her complaint by the trial court all involved the defendants reporting concerns about their children's safety in the presence of Kiesling in an alleged effort to prevent Kiesling from coming onto school property.

Because Kiesling alleges the reports to the principal were made in an effort to prompt action by the school, we agree with the trial court that these allegations may be properly characterized as part of an official proceeding even though the principal testified she had concluded her investigation into the Zuca incident. Indeed, according to own Kiesling's allegations, the defendants sought the specific official action of banning her from campus. These allegations are petitioning activity protected by the litigation privilege and the anti-SLAPP statute.

Kiesling also contends that the Bunetas and Hagens only "complained to the school about (i) neighborhood disputes between adults, and (ii) an accident they did not witness involving someone else's child." This assertion, however, is contradicted by the complaint's explicit allegations. As Kiesling herself states, the allegations at issue are that "the Bunetas [and Hagens]

23

repeatedly demanded that [Kiesling] be permanently banned from school campus and the public sidewalk." Whether the reasons for this alleged demand were related to their own conflict with Kiesling or her conduct at school, the fact remains that Kiesling's allegations are that the Bunetas and Hagens petitioned the principal and other district employees for official action to protect their children from her at school. Kiesling alleges they wanted to prevent Kiesling from coming onto campus and interacting with their children, and further to have the principal disciplined for failing to take this action. We agree with the trial court that this alleged conduct constitutes petitioning activity under section 425.16, subdivisions (e)(1) and (2), because they were statements made to school officials seeking official action.

Kiesling argues that *Lee, supra*, 135 CalApp.4th 89 and *Brody, supra*, 87 Cal.App.3d 725 were improperly relied on by the trial court because these cases concerned complaints about school officials, not parents. We do not agree that this distinction forecloses anti-SLAPP relief. In *Lee*, the plaintiff's claims for defamation, libel, conspiracy to interfere with prospective economic advantage, and intentional interference with prospective economic advantage were based on oral complaints and letters sent to school officials by a parent, who asserted that Lee, a high school baseball coach, had mistreated their baseball player son. (*Lee,* at pp. 93–94.) The Court of Appeal concluded this speech was protected petitioning activity because the communications were made "to prompt official action" by school authorities. (*Id*. at p. 96.) The same is true of allegations struck by the trial court here. The communications at issue were made by parents and, as alleged by Kiesling, sought official action by the school and the school district to ban Kiesling from the school. *Lee* contains no limitation requiring the petitioning activity

24

to be directed at a school official's or employee's conduct rather than another parent's conduct.

*Lee* cited *Brody*, which involved parent complaints to school officials about an assistant principal's handling of an altercation involving middle school students. The parents' complaints led to a hearing before the board of education, and eventually to a defamation and malicious prosecution lawsuit by the assistant principal against the parents. (*Brody, supra*, 87 Cal.App.3d at p. 728.) The Court of Appeal affirmed a directed verdict in favor of the parents and held that the parents' complaints were protected by the litigation privilege, including the initial communications by the parents that were intended to prompt official action by the school. (*Id.* at p. 733.)

Like *Lee*, the court in *Brody* determined that complaints to school officials intended to cause official action by the school constituted protected petitioning activity. Neither case draws a distinction between official action against a school employee or a parent who is alleged to have committed misconduct against a student. We see no reason to impose such a limitation in this case. The critical factor is whether the alleged communication is intended "to prompt official action" by the school. (See *Brody, supra*, 87 Cal.App.3d at p. 733 ["Underlying the absolute privilege is a recognition of the importance of providing utmost freedom of communication between citizens and public authorities whose responsibility is to investigate wrongdoing."].) Kiesling alleges just this, i.e. that the defendants sought to prompt the school to take official action by banning her from campus. Accordingly, the trial court properly found paragraphs 5(g), 28, 39–43,

portions of 47, 59–61, 67, 71, 73, 75–78, and portions of 80 and 103 of the complaint constitute protected activity.

B

*The Bunetas' and Hagens' Recording of Kiesling*

*Are Not Protected Conduct*

Kiesling next contends that the trial court's finding that the Bunetas' and Hagens' video recordings of her were protected petitioning activity was error because the recordings are not communicative conduct, were not made in anticipation of litigation, and the recordings were criminally illegal. The Bunetas respond that Kiesling waived this argument by not raising it in the trial court. Alternatively, the Bunetas contend the trial court correctly concluded that recording Kiesling was protected petitioning activity under the authority of *Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049 (*Tichinin*). The Hagens likewise argue that their act of recording Kiesling was protected pre-litigation investigation.

We agree with Kiesling that the alleged conduct by the Bunetas and Hagens of recording Kiesling to gather evidence for the various disputes between the parties does not fall within the protected conduct set forth in section 425.16, subdivision (e). The trial court concluded that after Michael Kiesling sent cease and desist emails to Rob Hagen on August 24, 2019, and to Jon Buneta on October 8, 2019, litigation by Kiesling was seriously considered and had ripened into a proposed proceeding. The court further found that these "defendants' video recordings were made as part of their effort to gather and preserve evidence for use in the various legal proceedings [including this one] and the then-ongoing school administrative proceedings." Citing *Tichinin, supra*, 177 Cal.App.4th at page 1065, the court found the

26

recordings were protected petitioning activities under section 425.16, subdivision (e)(1).

As Kiesling points out, however, the protection afforded by subdivision (e)(1) (and also subdivision (e)(2)) of the anti-SLAPP statute, by the statute's own terms, applies only to written and oral communications, and *not* other conduct. Only section 425.16, subdivision (e)(4) provides protection for other types of petitioning conduct, such as videorecording. Critically, to qualify for anti-SLAPP protection under this provision of the statute, the petitioning activity must concern a matter of public interest. (*Old Republic, supra,* 230 Cal.App.4th at p. 874.)

Here, the Bunetas and Hagens made no assertion that their conduct of videorecording Kiesling concerned a matter of public interest. Rather, Kiesling alleges that these defendants began recording Kiesling to harass her. Alternatively, the Bunetas and Hagens contend that they recorded Kiesling to gather evidence for litigation which became imminent when Kiesling's husband sent cease and desist letters threatening legal action. Under either version of events, the purpose of the videorecording concerned only a private dispute between the parties, not a matter of public concern. Accordingly, section 425.16, subdivision (e)(4) is not applicable.[7]

*Tichinin, supra*, 177 Cal.App.4th 1049, relied on by the Hagens in their motion and by the trial court, does not lead us to conclude otherwise.

---

[7] To avoid this problem, the Bunetas assert the video recordings are properly construed as "communicative conduct" that was intended to communicate " 'Hey, I'm video recording this (and you), so you better pay attention to your behavior and what you do, say, and how you act.' " This argument lacks merit. As discussed, section 425.16, subdivisions (e)(1) and (2) do not protect "communicative conduct." Rather, they protect only oral and written statements. The act of videorecording does not satisfy this requirement.

*Tichinin* did not consider whether prelitigation conduct constitutes petitioning activity for purposes of the first prong of the anti-SLAPP analysis. In *Tichinin*, the plaintiff lawyer sued the city for violation of his First Amendment right to petition the government after the lawyer was censured by the city council for hiring a private investigator to determine if a member of the council was having an extramarital affair with the city attorney. (*Id.* at p. 1055.) The plaintiff was investigating the affair because he believed his client, a developer, received an adverse determination from the council that the plaintiff suspected was the result of bias caused by the affair. The city council brought a successful anti-SLAPP motion and the plaintiff appealed. (*Ibid.*)

The plaintiff conceded the city's adoption of a resolution admonishing him was protected by the anti-SLAPP statute but argued his civil rights claim under 42 United States Code section 1983 had sufficient merit to satisfy the second prong of the anti-SLAPP analysis. (*Tichinin, supra*, 177 Cal.App.4th at pp. 1061–1064.) The portion of *Tichinin* cited by the trial court, and the Hagens, relates to this second-prong analysis, which required the court to consider whether the investigator's attempt to record the participants in the alleged affair was protected petitioning activity under the First Amendment (and not whether it was protected conduct for purposes of the first prong of the anti-SLAPP statutory analysis). (*Id.* at pp. 1062–1064.) The court agreed with the plaintiff that the conduct was "prelitigation investigation to support a potential claim" against the city council and "sufficiently related to the right to petition as to fall within the protected 'breathing space' of that [constitutional] right." (*Id.* at p. 1071.) *Tichinin*'s analysis concerning the merits of the plaintiff's First Amendment *civil rights claims* is not relevant to the question of whether the Bunetas' and Hagens'

28

videorecording of Kiesling is encompassed by the statutory language of section 425.16, subdivision (e)(1), (2), or (4).

In sum, we agree with Kiesling that the defendants' videorecording of her does not fall within the categories of protection afforded by section 425.16. The defendants failed to satisfy their burden on prong one of the anti-SLAPP analysis with respect to this conduct and the trial court erred by ruling to the contrary. Accordingly, the trial court's orders granting the Bunetas' and Hagens' motions to strike with respect to this conduct are reversed and on remand the trial court is directed to reinstate paragraphs 51, 53, 54, and 142–156 of Kiesling's complaint.[8]

C

*The Allegations Kiesling Identifies As Incidental*

*Are Protected Statements and Conduct*

Kiesling next asserts, without any explanation, that several specific allegations in the complaint struck by the trial court must be reinstated under *Baral v. Schnitt* (2016) 1 Cal.5th 376, 394 (*Baral*) because they "merely provide context, without supporting a claim for recovery...." To prevail on appeal, Kiesling " 'must establish both error and prejudice from that error. [Citation.] In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide

---

8      Because we conclude that the Bunetas and Hagens failed to establish that Kiesling's allegations of their videorecording of her were protected activity, and thus not entitled to anti-SLAPP protection, we do not reach the second prong of the analysis with respect to the invasion of privacy and eavesdropping claims. We express no view on the merits of these claims and hold only that the videorecording conduct by the defendants that forms the basis of the claims is not afforded protection by section 425.16, subdivision (e).

that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 597; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)

Because Kiesling has failed to make a cogent argument that would justify a reversal of the anti-SLAPP order with respect to these specific allegations, she has not established the trial court erred by striking paragraphs 28, 36, 39, 40–43, 73, 75, 78, and 80.

D

*Kiesling Failed to Meet Her Burden to Show a Probability of Prevailing On the Merits of Her Defamation Claim*

With respect to the second step of the anti-SLAPP analysis, Kiesling asserts that she showed a probability of prevailing on her defamation cause of action because the defendants failed to establish the litigation privilege applied to their alleged statements to school officials. In support, she points to Penal Code section 11172, subdivision (a), which allows criminal liability for the false reporting of child abuse, and asserts—for the first time on appeal—that statements she alleges the defendants made to school officials are illegal under this statute and thus not subject to the litigation privilege of Civil Code section 47, subdivision (b).

The trial court struck just one portion of one sentence in Kiesling's defamation cause of action. In paragraph 103, Kiesling alleges that the defendants "did, state, publicize, and/or republicize as fact, verbally and/or in

writing, to perhaps as many as several dozen individuals including, but not limited to [Kiesling's] neighbors, school parents, sports team parents, school authorities, teachers, and staff, school district authorities and staff, and/or [Kiesling's] gardener and pest control provider, the false assertions that [Kiesling] was a deranged and violet child abuser, and/or was inclined to commit violence against children, and/or was a menace, that the listener needed to 'watch out for' and 'be careful of.' " From this sentence, the court struck the words "school authorities, teachers, and staff, school district authorities and staff."

The court concluded that this portion of the defamation cause of action was not actionable because, as discussed, the defendants' statements to school personnel were part of an official proceeding and therefore protected under section 425.16, subdivision (e)(1). The court further found that Kiesling had failed to meet her burden to show she had a sufficient likelihood of success on the merits of her defamation claim, to the extent the claim was based on statements to school personnel, because such statements were protected by the litigation privilege of Civil Code section 47, subdivision (b), and therefore not actionable.

Kiesling argues this finding was error because "[a]s a matter of law, 'the litigation privilege of Civil Code section 47(b) does not protect [a]

31

defendant from the liability imposed by Penal Code section 11172(a).' "[9] She argues the statements to school staff were false reports of child abuse subject to criminal penalties, and therefore the litigation privilege does not apply. This argument, however, was not asserted by Kiesling in the trial court.

Instead, Kiesling argued only that sufficient evidence supported the claim. She did not address the defendants' assertions in their motions to strike that the alleged statements to school officials were protected by the litigation privilege because the statements were made to prompt action by the school, either to keep the defendants' children separate from Kiesling's children or to keep Kiesling off of the school campus. Kiesling's failure to challenge this argument in the trial court dooms her challenge in this court

---

[9] Penal Code section 11172, subdivision (a), provides civil and criminal immunity for mandated reporters of abuse and conditional immunity for all other reporters, which applies unless the person makes the report with knowledge or reckless disregard of its falsity. The provision states: "No mandated reporter shall be civilly or criminally liable for any report required or authorized by this article, and this immunity shall apply even if the mandated reporter acquired the knowledge or reasonable suspicion of child abuse or neglect outside of their professional capacity or outside the scope of their employment. Any other person reporting a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report, and any person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused. No person required to make a report pursuant to this article, nor any person taking photographs at their direction, shall incur any civil or criminal liability for taking photographs of a suspected victim of child abuse or neglect, or causing photographs to be taken of a suspected victim of child abuse or neglect, without parental consent, or for disseminating the photographs, images, or material with the reports required by this article. However, this section shall not be construed to grant immunity from this liability with respect to any other use of the photographs."

because it was her burden to show the claim's merit, including that the defendants' alleged statements to school personnel were not protected by the litigation privilege. (See *Baral, supra*, 1 Cal.5th at p. 384 [It is the plaintiff's burden at the second step of the anti-SLAPP analysis "to demonstrate the merit of the claim by establishing a probability of success."].)

Further, because Kiesling did not make any argument in the trial court showing how the statements to school personnel fell outside the litigation privilege, her attempt to do so in this court (relying on Penal Code section 11172, subdivision (a)) is forfeited. (See *Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011 ["Issues presented on appeal must actually be litigated in the trial court .... ' "[W]e ignore arguments, authority, and facts not presented *and litigated* in the trial court." ' "]; *In re Marriage of Elali & Marchoud* (2022) 79 Cal.App.5th 668, 682 [" '[T]he appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.' "].) Accordingly, the trial court's orders striking paragraphs 5(g), 28, 39–43, portions of 47, 59–61, 67, 71, 73, 75–78, and portions of 80 and 103 (the allegations related to the defendants' statements to school staff, including the

portion of the defamation cause of action discussed in this section) are affirmed.[10]

## III

### *Attorney's Fees & Costs*

After the trial court granted the anti-SLAPP motions, the defendants moved for attorney's fees and costs pursuant to the statute's fee and cost shifting provision, section 425.16, subdivision (c). The trial court awarded the Bunetas $12,548 in attorney's fees and costs, the Hagens $13,248; and Noon $24,000. On appeal, Kiesling argues the awards should be reversed because the anti-SLAPP motion should not have been granted. Because we conclude that the trial court erred by granting the motion with respect to Kiesling's claims for invasion of privacy and eavesdropping based on the Bunetas' and Hagens' conduct of videorecording her and her family, we conclude the fee award orders with respect to these defendants must be reversed and the matter remanded for reconsideration.

" 'An award of attorney fees to a partially prevailing defendant under section 425.16, subdivision (c) ... involves competing public policies: (1) the public policy to discourage meritless SLAPP claims by compelling a SLAPP plaintiff to bear a defendant's litigation costs incurred to eliminate the claim from the lawsuit; and (2) the public policy to provide a plaintiff who has facially valid claims to exercise his or her constitutional petition rights by filing a complaint and litigating those claims in court. [Citations.] In balancing these policies, ... the court should first determine the lodestar

---

10    In her briefing, Noon points out that the court's orders did not strike the second sentence of paragraph 47 of the complaint, which states " 'Defendants defamed [Kiesling] to school authorities.' " We agree with Noon that this appears to be an inadvertent oversight by the trial court and on remand direct that this additional sentence be stricken.

amount for the hours expended on the successful claims, and, if the work on the successful and unsuccessful causes of action was overlapping, the court should then consider the defendant's relative success on the motion in achieving his or her objective, and reduce the amount if appropriate." (*Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1305.)

Here, for obvious reasons, the trial court considered the Bunetas' and Hagens' motions for fees based only on the orders it issued. Because we conclude that those orders must be partially reversed and instruct the trial court on remand to reinstate some of the allegations that were stricken, the trial court must reevaluate the defendants' requests for attorney's fees in light of this change. We express no opinion with respect to how much the fee awards should be reduced; that is a matter for the trial court on remand.

With respect to Noon, Kiesling contends that the court's fee order in her favor must be reversed even if we affirm the underlying order granting in part her motion to strike. Kiesling argues that the court erred by awarding Noon the majority of the fees she requested because Noon was only partially successful on her motion to strike, and did not obtain her objective of "extract[ing] herself from this lawsuit *entirely*."

We review an anti-SLAPP attorney fee award under the deferential abuse of discretion standard. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131, 1130.) The trial court's fee determination " ' "will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Id.* at p. 1132.) An attorney fee dispute is not exempt from generally applicable appellate principles: "The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the

35

evidence is conclusive." (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561–562.) We may not reweigh on appeal a trial court's assessment of an attorney's declaration (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622–623) and it is for the trial court "to assess credibility and resolve any conflicts in the evidence. Its findings ... are entitled to great weight. Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.)

We agree with Noon that Kiesling has not shown the trial court's decision to award Noon the majority of the attorney's fees she requested was an abuse of discretion. Noon requested a total award of $35,500, consisting of $29,855 in attorney's fees and $991 in costs for prevailing on her special motion to strike and $4,500 in fees and $154 in costs related to her motion seeking an award of attorney's fees and costs. The court awarded Noon $24,000 for the attorney's fees related to her motion to strike, discounting the amount of fees requested to eliminate (1) "attorney time not related to the anti-SLAPP motion; (2) inefficiencies and duplication of effort; and (3) the fact that [Noon] did not prevail on the entirety of her special motion to strike."

As Noon asserts, her anti-SLAPP motion asked the court to strike the allegations contained in paragraphs 28, 42, 45, 47, 59–61, 67, 71, 75–78, 80, and 103. Of these paragraphs, the court granted the motion as to paragraphs 28, 42, a portion of 47, 59–61, 67, 71, 75-78, and portions of 80 and 103. The court denied the motion as to just one full paragraph, 45, and portions of 47, 80 and 103. It is obvious that Noon was successful on her motion, and that she obtained the majority of the relief that she sought. The trial court, in turn, evaluated the success achieved by Noon and awarded her the majority

36

of the fees she requested, discounting that amount to account for the fact that she did not achieve complete success on her motion.  This was a reasonable calculation by the trial court and did not constitute an abuse of its wide discretion under section 425.16, subdivision (c).

IV

*Noon's Cross-Appeal*

In her cross-appeal, Noon argues the trial court erred by not granting her motion to strike in its entirety.  She contends that all of the alleged statements she made concerning Kiesling, including those to individuals who were not school officials, were issues of public interest and thus subject to protection under section 425.16, subdivision (e)(4).  She argues that the alleged speech related to "general concerns of the safety and well-being of children in the community," which she asserts is a matter of public interest. Kiesling responds that the statements she alleges Noon made were private in nature and had no public purpose because she alleges the statements were made only to harass Kiesling.

"Our courts have ably distilled the characteristics of 'a public issue or an issue of public interest.' " (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn.com*).)  "The inquiry under the catchall provision[, section 425.16, subdivision (e)(4),] calls for a two-part analysis rooted in the statute's purpose and internal logic.  First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech.  (§ 425.16, subd. (e)(4).)  Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id*. at pp. 149–150.)  " '[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself

37

contribute to the public debate.' " (*Id.* at p. 150; see also *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 ["[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute" is not enough].)

The alleged statements at issue here, that Noon falsely told other community members that Kiesling intentionally pushed her child off her rolling backpack and was a child abuser, fail on the second step of this analysis. Kiesling's complaint asserts Noon made these allegedly false statements to ostracize Kiesling from the community. The alleged purpose of the statements was not to further public debate about child safety but to harm Kiesling. For this reason, we agree with the trial court that these statements do not fall within the protection afforded by the anti-SLAPP's catchall provision. (See *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 374 (*Cross*) [" 'the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy" ' "]; *Kettler v. Gould* (2018) 22 Cal.App.5th 593, 605–606 (*Kettler*) ["We reject the notion that 'the chance' for elder abuse and fraud by a financial planner, without more, can transform a single claim of elder abuse and embezzlement into an issue of public interest. [¶] ... [¶] The 'chance' of misconduct toward others is completely speculative."].)

The purpose of the alleged statements (i.e. to harm Kiesling) and the context they were made in (i.e. the ongoing feud between these sets of parents), show there was no nexus between the allegations about Kiesling and the public debate concerning child safety. *Kettler* is instructive on this issue. In *Kettler*, the court *declined* to extend anti-SLAPP protection to allegedly defamatory statements made to an accrediting agency about a financial advisor taking advantage of one elderly couple. The court held that the one alleged incident of "abuse" was not sufficient to turn a private dispute

38

between the advisor and the couple's disgruntled son into discourse on the broader public issue of financial elder abuse. (*Kettler, supra*, 22 Cal.App.5th at pp. 605–606; see also *FilmOn.com, supra*, 7 Cal.5th at pp. 150–151 ["What it means to 'contribute to the public debate' " is "whether a defendant— through public or private speech or conduct—*participated in, or furthered, the discourse* that makes an issue one of public interest."], emphasis added.) Similarly, here, the discreet alleged incidents of "abuse" by Kiesling are insufficient to turn those allegations, which occurred in the context of a private dispute between the parties, into a contribution to the broader public debate on child safety.[11] We agree with the trial court's rejection of this

---

[11] Noon cites *Cross, supra*, 197 Cal.App.4th 357 in support of her argument. *Cross* involved allegations by a property owner against her former tenants for breach of the implied covenant of good faith and fair dealing based on the tenants' disclosure to a potential buyer that a registered sex offender lived nearby. The Court of Appeal reversed the trial court's determination that the disclosure did not constitute a matter of public interest. In its holding, the court looked to three earlier cases finding speech about sexual abuse of children qualified for anti-SLAPP protection, as well as the existence of the laws requiring "the collection and dissemination of information about registered offenders" and "the Legislature's expressions of intent in enacting those laws" to protect children from abuse. (*Id*. at p. 378.) The court also held that "the continuous access to and dissemination of information about the presence of a registered offender in the area represents ongoing 'discussion,' albeit a cyber discussion, between local authorities and local residents about that particular offender." (*Id*. at p. 383.) *Cross* concerned the location of a *convicted* sex offender and the ongoing public discourse and debate about such information. We do not agree with Noon that the case supports anti-SLAPP protection for Kiesling's allegations that Noon was making *false allegations* of child abuse. Instead, Noon has abstracted from Kiesling's complaint only "a broad and amorphous public interest" that is insufficient to qualify for anti-SLAPP protection. (*Id*. at p. 379.)

argument and affirm the court's order partially denying Noon's motion to strike.[12]

## DISPOSITION

The orders granting in part and denying in part the defendants' motions to strike are affirmed in part and reversed in part. On remand, the trial court is directed to reinstate paragraphs 51, 53, 54, 142–156 of Kiesling's complaint and to strike the second sentence of paragraph 47.

In addition, the orders awarding the Hagens and the Bunetas attorney's fees and costs are reversed. On remand, the trial court may consider renewed requests by these defendants for fees and costs in light of this opinion. The order awarding Noon attorney's fees and costs is affirmed.

The Hagens, the Bunetas, and Kiesling are to bear their own costs of appeal. Noon is awarded her costs of appeal as respondent and shall bear the costs of her own appeal.

---

*Murray v. Tran* (2020) 55 Cal.App.5th 10, which Noon cites, is distinguishable. There, we held that allegedly defamatory statements about a dentist's malpractice by a former business partner of the dentist to the dentist's new employer were protected. We concluded these statements had a sufficient nexus to the public issue of protecting dental patients from sub-standard care and "promoted the public conversation on that issue because they were made to a person who had direct connection to and authority over the patient population with whom" the dentist cared for. (*Id*. at p. 35.) Noon makes no similar showing between Kiesling's claim that Noon allegedly defamed Kiesling by telling others she had harmed Noon's daughter and the asserted public issue of protecting children from Kiesling.

[12]    Noon's request for attorney's fees for her cross-appeal is denied.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

DO, J.